Not Reported in F.Supp.2d, 2007 WL 1813762 (E.D.Cal.)

<u>Motions, Pleadings and Filings</u>
Only the Westlaw citation is currently available.

<u>Trial Transcripts with Streaming Media</u>

United States District Court,
E.D. California.
CARGILL INCORPORATED and Can Technologies, Plaintiffs,
v.
Matthew BUDINE; Douglas W. Degroff; Diversified Dairy Solutions, LLC; Luciana Jonkman;
Progressive Dairy Solutions; Todd Schwegel; and Brian Sundberg, Defendants.

No. CV-F-07-349-LJO-SMS.
June 22, 2007.

<u>David J. Miclean</u>, <u>Enrique DeJesus Duarte</u>, <u>Katherine Durkish Prescott</u>, Fish and Richardson P.C.,
Redwood City, CA, for Plaintiffs.

<u>Christopher Todd Holland</u>, <u>Kenneth Edward Keller</u>, Krieg, Keller, Sloan, Reilley & Roman LLP, San
Francisco, CA, <u>Harry C. Dehaan</u>, Pro Hac Vice, Law Office of Harry Dehaan, Twin Falls, ID, <u>Roy S.</u>
<u>Payne</u>, Pro Hac Vice, <u>Sam N. Gregorio</u>, Pro Hac Vice, Sam N. Gregorio APLC, Shreveport, LA, <u>Gregory</u>
<u>Scott Mason</u>, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, CA, <u>Jeffrey Scott Schoppert</u>,
<u>Wendy L. Wyse</u>, Keegin Harrison Schoppert Smith & Karner LLP, San Rafael, CA, for Defendants.

## ORDER ON MOTION TO DISQUALIFY COUNSEL

<u>LAWRENCE J. O'NEILL</u>, United States District Judge.

### I. INTRODUCTION

**\*1** At the May 23, 2007 scheduling conference before this Court, Plaintiffs' counsel moved to
disqualify Mr. Roy Payne as counsel representing Plaintiffs Matthew Budine ("Budine"), Luciana
Jonkman ("Jonkman"), Brian Sundberg ("Sundberg"), and Progressive Dairy Solutions (collectively
referred to as "Progressive Defendants"). An order by this Court set a hearing on that motion for June
26, 2007 (Doc. 84). On May 30, 2007, Plaintiffs filed a motion to disqualify all counsel appearing for
the Progressive Defendants who are also involved in an action entitled *John Burford, et. al. v. Cargill,
Inc.*, U.S. District Court, Western District of Louisiana, Civil Action No. 05-0283 (hereinafter referred
to as " *Burford*" ). Lead counsel for the plaintiffs in *Burford* are Roy S. Payne ("Payne") and Sam N.
Gregorio ("Gregorio"), APLC in Shreveport, Louisiana, and Harry DeHaan ("DeHaan") of Twin Falls,
Idaho (collectively referred to as "Burford counsel"). Payne, Gregorio, and DeHaan recently appeared
as counsel for the Progressive Defendants in this action, prompting the instant motion.

The issue presented is whether Burford counsel's representation of the Progressive defendants in
this action gives rise to the appearance of impropriety and will have an adverse continuing affect on
this judicial proceeding which would unduly prejudice Cargill and interfere with the administration of
justice. Cargill raises these legal and ethical issues based on: (1) discussions between the Progressive
defendants, especially Budine, and Cargill counsel in preparation of Cargill's defense in *Burford;* (2)
the Protective Order in the *Burford* case; and (3) the confidentiality agreements between Cargill and
Progressive defendants, at issue in this case. The various complex relationships between the parties-
Cargill, the Progressive defendants, and Burford counsel-span from California to Louisiana and raise a
number of legal and ethical issues, including the attorney-client privilege, trade secret agreements,
and a conflict of interest. This Court finds that the danger of disclosure of protected information is
substantial. Accordingly, Plaintiffs' motion to disqualify Burford counsel is GRANTED.

### II. BACKGROUND

#### A. Progressive Defendants
In the case currently before this Court, Cargill filed a complaint against the Progressive

defendants, Douglass DeGroff, and Todd Schwegel on March 1, 2007. Cargill's complaint contains fourteen (14) claims, including, misappropriation of trade secrets, breach of contract, unfair competition, fraud, conversion, defamation, and breaches of duty. On April 16, 2007, the Progressive Defendants answered the complaint, which included 41 affirmative defenses and eighteen (18) counterclaims against Cargill and CAN.

Budine was General Manager of the Pacific Coast District of CAN until he resigned from that position on January 31, 2007. Declaration of Matthew BUDINE ("BUDINE Decl."), ¶ 3; Complaint, ¶ 29. Budine had held that position since 2000. Affidavit of Budine, ¶ 1, Ex. C to Carpenter Decl. As General Manager, Budine supervised more than 180 employees. Complaint, ¶ 29. He was also a long-standing member of Cargill's Dairy Vision Team. Complaint, ¶ 30. Budine signed a confidentiality agreement with Cargill. *Id.*, ¶ 37.

**\*2** Sundberg and Jonkman were dairy management consultants under Budine's management. Complaint, ¶¶ 31-32. They both signed confidentiality agreements with Cargill. *Id.* ¶ 38. After leaving Cargill at the end of January 2007, Budine, Sundberg and Jonkman together formed Progressive Dairy Solutions, where they are all now employees. See Declarations of BUDINE, Sundberg and Jonkman.

In this action, Cargill alleges, among other claims, that the Progressive defendants breached the confidentiality agreements, misappropriated trade secrets, entered into unfair competition, breached their duty of loyalty and have defamed Cargill.

## B. *Burford v. Cargill*
On May 3, 2006, plaintiffs filed a Second Amended Class Action Complaint in the United States District Court, Western District of Louisiana, making national class allegations against Plaintiffs in this case, Cargill Incorporated ("Cargill") and CAN Technologies, Incorporated "(CAN"). Ex. B to Carpenter Declaration. The Burford plaintiffs seek to represent a national class of dairy farmers who purchased Cargill's customized dairy feed pellets. *Id.*, ¶ 3. They allege that the customized dairy pellets purchased from CAN led to various problems with their dairy cows, which subsequently caused monetary loss.[FN1] The *Burford* case is still in the discovery phase.

> FN1. Cargill Animal Nutrition ("CAN") is a part of Cargill which produces customized animal nutrition solutions, including the dairy pellets as issue in *Burford v. Cargill*, Civil Action No. 05-0283 (W.D.La.) ( *"Burford"* ).

A Protective Order was signed by the Court on September 19, 2006, that prohibits the use of confidential information disclosed by a party beyond the scope of Burford. Carpenter Decl., Ex. D. Shortly after that order, Cargill produced more than 130,000 pages of documents to Payne and DeHaan. Carpenter Decl., ¶ 14. The majority of these documents were marked "Confidential" or "Highly Confidential" under the terms of the Protective Order. *Id.* Burford counsel have not disputed Cargill's designation of these documents. *Id.*

## C. Progressive defendants and *Burford*
Currently pending before the *Burford* court is a motion regarding the confidentiality agreements signed by the Progressive defendants. Specifically, the plaintiffs in *Burford* have moved for a protective order from the court "(1) declaring that any confidentiality agreements or nondisparagement clauses executed by the former employees of defendant shall not bar their testimony in this matter ... [and] (2) prohibiting Cargill from taking any adverse action against Budine, Jonkman, Sundberg, DeGroff, and Schwegel for their testimony in this matter." Plaintiffs' Motion for Protective Order, *Burford* (May 9, 2007). Plaintiffs' motion for an order about the confidentiality agreements is centered entirely around the defendants in this case and their counterclaims. In that motion, it is asserted that "Plaintiffs' counsel have recently learned that five employees from the Pacific Coast Division of defendant Cargill terminated their employment ... leading to a lawsuit being filed against them [describing the Progressive defendants and the action before this Court]." *Id.*, ¶ 2. Burford counsel then asserts that the Progressive defendants may be "fearful of giving testimony and other discovery assistance to plaintiffs" because of the "TRO in the

California suit." *Id.,* ¶ 3. Plaintiffs include direct quotes from the complaint and answer in this action in support of their motion before the Louisiana Court. *Id.,* ¶¶ 5-7. Burford counsel then conclude that "the allegations of the Counterclaim in the California suit establish that the deposition testimony and information of these five former employees is highly relevant to the claims asserted in this class action lawsuit and would be helpful to [the Louisiana] Court in determining whether the experiences of the named Plaintiffs are typical of those of the entire class." *Id,* ¶ 8. Finally, Burford counsel prays that the Louisiana court declare "that any such confidentiality agreements and nondisparagement clauses [signed by Progressive defendants] are not legally enforceable to prevent the testimony of former employees....nor prevent them from conferring with [Burford] counsel." *Id.,* ¶ 10.

**\*3** In this case, the Progressive defendants rely on *Burford* in their counterclaim against Cargill. See Answer, ¶¶ 18. Progressive defendants plead as facts in their counterclaim against Cargill the allegations by Burford against Cargill. Answer, ¶¶ 19-29.

### D. Budine's Involvement with *Burford* while an executive with Cargill

As previously noted, Budine was the District General Manager of CAN's Pacific Coast business. Cargill argues that because the Burford plaintiffs purport to represent a national class, the *Burford* action potentially affects CAN's dairy business throughout the United States, including the geographic area Budine managed. As a result, Cargill's legal team consistently involved both the U.S. district General Managers and the Dairy Vision Team in strategic discussions concerning *Burford*. Decl. Karen Gooch ("Gooch Decl."), ¶ 2; Carpenter Decl., ¶ 6. Cargill further contends that Cargill's in-house counsel has been in frequent contact with both the General Managers and members of the Dairy Vision team, including Budine in particular. Gooch Decl., ¶ 4-5. Such discussions included in-house counsel's assessment of the *Burford* case and its potential impact on Cargill. *Id.,* ¶ 3. Cargill further contends that Cargill's outside counsel also worked closely with Budine. It is alleged that at least six privileged discussions occurred between outside counsel and Budine. Carpenter Decl., ¶ 7.[FN2]

> FN2. Carpenter avers that none of the six contacts his firm had with Budine concerning the Burford case included any Cargill business employee other that Budine. Second Declaration of Carpenter, ¶ 2. Budine contends that he does not remember Carpenter and any contacts must occurred during conference calls with other General Managers, in which the attorney did not participate. Budine Decl. ¶

One such discussion was a telephonic conference on July 12, 2006, which lasted 1.5 hours. Mark Carpenter ("Carpenter"), outside counsel for Cargill, contends that the subjects he discussed with Budine in that meeting were (1) a status report on and assessment of the *Burford* lawsuit and (2) a detailed dialogue about company and district policies with which counsel would need to be familiar to defend the *Burford* action. *Id.,* ¶ 8; Declaration of Christian S. Walker,¶ 4. In response, Budine does not remember Mr. Carpenter being on that call at all. Budine further asserts that the substance of that call was to explain to Mr. Walker (another outside counsel for Cargill) "how the Pacific Coast District business was structured, how we focused on the customers and the health of their cows.... Mr. Walker did ask several questions about our interactions with customers and how we interacted with the with respect to generating feed formulations, sending those formulations off to Cargill...." Budine Decl., ¶ 20. Budine concludes that "nothing [Mr. Walker] asked me seemed to be anything confidential or secret about Cargill's operations, let alone something privileged regarding the Burford litigation." *Id.*

Mr. Rob Sheffer ("Sheffer"), General Manager of Cargill Animal Nutrition's Albany district also had a conversation with Mr. Carpenter on July 12, 2006. Declaration of Rob Sheffer ("Sheffer Decl."), ¶ 6. He understood that the legal team was having similar conversations with other U.S. general managers. That conversation was quite lengthy. In that meeting, all of his numerous questions about *Burford* were answered and "Mr. Carpenter and Ms. Gooch [Cargill lawyer and paralegal] provided an in-depth discussion of the Burford case, explained to me their understanding of the nature of the plaintiffs' claims, and shared their thoughts for an approach as to how Cargill might defeat the plaintiffs' later motion for class certification." *Id.* Sheffer "considered this conversation to be a

privileged attorney-client communication." *Id.*

**\*4** In August 2006, Cargill contends that outside counsel visited Budine in person to collect documents for Burford, identify additional sources of information, and again discuss policies that might bear upon Burford. Carpenter Decl., ¶ 9. Budine recalls that at some point in the summer of 2006, he was "told by Cargill's management ... that Cargill's lawyers on the *Burford* case would be visiting the Pacific Coast District to review and copy certain files we had in our facilities." Budine Decl., ¶ 22. Budine contends that he met with the lawyers when they arrived, but that at no point did those lawyers explain what they were looking for or discuss strategy for the *Burford* litigation Budine Decl., ¶ 23-25. Budine further avers that he has no recollection of which documents and files were collected by Cargill's attorneys. *Id.*

Carpenter asserts that he engaged in at least three additional privileged discussions with Budine in late 2006, which led to the filing of an affidavit executed by Budine in December 2006 in the Burford 2006. A copy of that affidavit is attached to Carpenter's Declaration as Exhibit C. In that affidavit, Budine, General Manager for CAN at that time, discussed his involvement with negotiating a settlement with Sunnyside Dairy and the dairyman's eventual rejection of the proposed settlement. *Id.* Budine responds that "no lawyer ever took the time to explain to me anything at all about how the information in that declaration might relate to the Burford action at the time I reviewed and signed it." Budine Decl.,¶ 26. Carpenter disputes this contention, saying, "I would never work with an employee of a client on an affidavit or declaration without first discussing the connection between the affidavit and the matter at issue." Second Carpenter Decl., 3.

Last week in *Burford,* plaintiffs(presumably through Burford counsel) filed a motion for leave to amend to add 38 new named plaintiffs in the proposed class action. One of those proposed dairies is Sunnyside Dairy, that which is the subject of Budine's affidavit which he submitted in December 2006 in the *Burford* case. Second Carp. Decl., ¶ 4. Jonkman was the Dairy Specialist for Sunnyside Dairy. Further, Carpenter contends that in December 2006, he had two discussions with Budine about a second dairy proposed as a plaintiff. *Id.* Carpenter discussed this same dairy with Sundberg. *Id.* Carpenter asserts that these discussions revolved around the dairy's potential role in *Burford. Id.*

In early January 2007, just weeks before Budine left Cargill, Carpenter engaged in at least one telephone conversation and one written communication with Budine that stemmed from Cargill counsel's desire to learn more about MAX and BILLS, Cargill's ration building and feed formulation programs. Carpenter Decl., ¶ 11. Budine explains Carpenter asked about the computer programs and that he referred Carpenter to Schwegel, who was familiar with those programs. Budine Decl., ¶ 31.

**\*5** Cargill further asserts that Budine's participation in the Dairy Vision Team gave him access to privileged information. Budine asserts that the team never discussed anything of a confidential or proprietary nature. Budine Decl., ¶ 11. Sheffer, until recently the chairperson of the Dairy Vision Team asserts that information at these meetings is considered confidential and not to be disseminated. Sheffer Decl.,¶ 3. Sheffer further asserts that while Budine was still a member of the team, Cargill in-house lawyer Karin Nelsen and paralegal Karen Gooch participated in multiple discussions of Burford in Dairy Vision Team meetings and conference calls. *Id.,* ¶ 4.

In sum, Cargill contends that Budine had extensive access and involvement with privileged information by virtue of his position of General Manager and member of the Dairy Vision Team. Budine counters that he had no access or involvement in any privileged communications with Cargill's attorneys.

Cargill identified Budine as a witness in its Responses to Interrogatories served on September 15, 2006 in the *Burford* case.

**E. Burford Counsel**
Since 2003, DeHaan has prosecuted four other cases against CAN. In each of those cases, DeHaan has executed on behalf of himself and his clients a confidentiality agreement to prevent him or his clients from revealing any "confidential trade secrets or propriety ration formulation computer programs.". DeHaan Decl, ¶ 5. DeHaan's first contact with the Progressive defendants was around

March 1, 2007, when Sundberg called his Idaho office and inquired about the status of the class action lawsuit. At that time, Sundberg advised DeHaan that the five employees who are defendants in this case left Cargill. *Id.*, ¶ 8. On March 4, 2007, DeHaan met with the Progressive defendants in California. Declaration of Todd Schwegel ("Schwegel Decl."), ¶ 4. Sundberg, Budine, and Jonkman told co-defendant Todd Schwegel ("Schwegel") that at that meeting, DeHaan wanted to be "part of the complaint against Cargill. They also said that they would use DeHaan as leverage against Cargill." Schwegel Decl., ¶ 4. DeHaan recommended two California attorneys to the Progressive defendants at that time. DeHaan Decl., ¶ 9.

Ken Keller, counsel for Progressive defendants in the earliest stages of this litigation, arranged a meeting between Progressive defendants and Burford counsel. See Declarations of Keller, DeHaan, Gregorio, and Payne. Inexplicably, none of the declarations of the attorneys gives the date of this meeting.

A second meeting was held at Mr. Keller's office. *Id.* At the beginning of that meeting, a letter was executed and presented to Burford counsel, confirming that no documents or information subject to the attorney-client privilege would be provided to the Burford counsel. Declaration of Keller, Ex. B (letter dated May 4, 2007).

On May 21, 2007, counsel for Plaintiffs sent a letter to Burford counsel requesting that they withdraw from representation in the instant action. In the letter, Plaintiffs state that Burford counsel's representation of the Progressive defendants "creates significant concern regarding conflicts of interest and potentially improper use of confidential information." Pl. Mot. Disqualify, Ex. F. Plaintiffs further mention that "Mr. Budine had extensive involvement, with still a Cargill employee, in privileged and strategic discussions assisting Cargill in its defense of the *Burford* action." *Id.* Plaintiffs also note that "defendants allege in their counterclaim against Cargill that the facts underlying the *Progressive* case are related to the *Burford* case, and vice versa." *Id.* Cargill outlines several concerns it has, concluding that "it will be forced to take the appropriate actions to prevent further harm arising from the dual representation." *Id.*

**\*6** On May 22, 2007, a Pro Hac Vice Order was signed to add Payne as counsel for the Progressive Defendants. (Doc. 79). On the same day, Gregorio was admitted by Pro Hac Vice Order (Doc. 80). On May 25, 2007, DeHaan was added as counsel by Pro Hac Vice Order (Doc. 85).

Also on May 22, 2007, Payne responded to Cargill's letter. In it, Payne declines to withdraw from the case. Payne further asserts that "You have already once before in this litigation made a baseless charge against me of unethical behavior, only to withdraw the charge when we came before the Judge. If you make such a baseless charge again, I will pursue all available sanctions." Pl. Mot. Disqualify, Ex. G. This motion was raised the following day.

### III. ARGUMENTS
#### A. Cargill's Arguments
Cargill argues that Burford counsel's representation of Progressive defendants creates an appearance of impropriety in violation of Canon 9 of the Model Rules of Professional Conduct and the Court should use its inherent power to regulate the conduct of lawyers appearing before it to disqualify Burford counsel. Cargill further argues that Burford counsel's representation of Budine, until recently a high-level Cargill manager with significant knowledge of Cargill privileged matters pertaining to Burford, creates an appearance of impropriety, which undermines the public's confidence in the legal profession and undermines the integrity of these judicial proceedings. Third, Cargill argues that Burford counsel's representation of Budine violates California Rule of Conduct 3-310(c)(1) because there is a potential conflict of interest between the Burford plaintiffs and the Progressive defendants. Lastly, Cargill contends that Burford counsel's dual role ensures that Cargill's confidential information will be misused in violation of the Protective Order and Cargill's right to maintain the confidentiality of its proprietary information.

#### B. Progressive defendant's arguments
Progressive defendants do not have any material privileged information concerning the *Burford* matter. Most of the communications between Cargill's lawyers and defendants were simple requests

by the lawyers for information, either to answer discovery requests or to educate the lawyers on the way Cargill does business. Progressive defendants further argue that the communications with Budine were simple statements to a group of employees that the litigation "is progressing" or "we are defending the case." Progressive defendants contend that ex parte contact with former employees of a party, even management employees, is permitted and that the attorney-client privilege does not apply to all statements by the employees of a corporation to its attorneys. It does not protect disclosure of the underlying facts which were communicated, as is the case here. Furthermore, there is no presumption of disclosure in this case. Finally, Progressive defendants contend that there is no actual or apparent impropriety in this matter, no violation of any Confidentiality Orders either have occurred or will occur, and there is no conflict of interest. Nothing about Burford counsel's involvement will impugn the integrity of the judicial process. Disqualification of counsel is a drastic remedy, which interferes with a party's right to his/her choice of counsel, and which further entails great expense to the litigant. Cargill only brings the instant action to harass defendants and granting this motion will chill defendant's ability to choose freely their attorneys who will represent them on an affordable, contingency fee basis and bring their expertise on Cargill.

## IV. DISCUSSION
## A. Standard of Review and Applicable Law

### 1. Generally

**\*7** "[T]he business of the court is to dispose of litigation and not to oversee the ethics of those that practice before it unless the behavior taints the trial." _Continental Ins. Co. v. Superior Court, 32 Cal.App.4th 94, 111 n. 5, 37 Cal.Rptr.2d 843 (1995)_. In the matter before this Court, Plaintiffs argue that the continued representation of the Progressive defendants by Burford counsel (1) gives rise to the appearance of impropriety; (2) creates a conflict (or potential conflict) of interest; (3) violates confidentiality orders and privileged information; and (4)assaults the integrity of these judicial proceedings. In considering these assertions of ethical violations, this Court is bound by Local Rule 83-180(e), which reads in pertinent part:

Every ... attorney ... shall comply with the Rules of Professional Conduct of the State Bar of California and decisions of any Court applicable thereto, which are hereby adopted as standards of conduct in the Court. In the absence of applicable standards therein, the Model Code of Professional Responsibility of the American Bar Association may be considered guidance. No attorney admitted to practice before this Court shall engage in conduct that degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice.

From this rule, three points are clear. First, this Court shall hold attorneys before it to the standards as set out by the California Rules of Professional Conduct.<u>FN3</u> Second, in the absence of applicable California standards, the Court may use the Model Code of Professional Responsibility as guidance. Finally, this Court must protect the integrity of the Court and the fair administration of justice.

<u>FN3.</u> The California Rule of Professional Conduct provides that "[e]thics opinions and rules and standards promulgated by other districts and bar associations and bar associations may also be considered." Cal. R. Prof. Cond. 1-100(A).

This Court's authority to disqualify an attorney arises from the Court's inherent power to preserve the integrity of the adversarial process. _Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); Erickson v. Newmar Corp., 87 F.3d 298, 300 (9th Cir.1996)_. In California, a "common theme" among disqualification cases have been noted as follows: "If the status or misconduct which is urged as a ground for disqualification will have a continuing effect on the judicial proceedings which are before the court, it is justified in refusing to permit the lawyer to participate in such proceedings ... If, on the other hand, the court's purpose is to punish a transgression which has no substantial continuing effect on the judicial proceedings to occur in the future" disqualification is improper. _Chronometrics, Inc. v. Sysgen, Inc., 110 Cal.App.3d 597, 607, 168 Cal.Rptr. 196._

In *Gas-A-Tron of Ariz. v. Union Oil Co.*, 534 F.2d 1322 (9th Cir.1976), *cert. denied sub nom. Shell Oil Co. v. Gas-A-Tron of Ariz.*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976), the Ninth Circuit stated:

Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised. It is the duty of the district court to examine the charge, since it is that court which is authorized to supervise the conduct of the members of its bar. The courts, as well as the bar, have a responsibility to maintain public confidence in the legal profession. This means that a court may disqualify an attorney for not only acting improperly but also for failing to avoid the appearance of impropriety.

***8** *Gas-A-Tron*, 534 F.2d 1322, 1324-25 (quoting *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382,1385-86 (3rd Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973) (quoted in *Erickson v. Newmar Corp.*, 87 F.3d 298, 303 (9th Cir.1996); see also *Terrebonne Ltd. v. Murray*, 1 F.Supp.2d 1050, 1054 (E.D.Cal.1998) (quoting the passage above). Therefore, this Court shall examine the charges set forth to determine whether there has been improper conduct, an appearance of impropriety, or other conduct which "degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice." L.R. 83-180(e).

The parties dispute whether this Court can apply Model Code of Professional Conduct ("Model Code) Canon 9, or whether California standards apply.. The parties further dispute whether the Ninth Circuit Court of Appeals recognizes the disqualification of an attorney based solely on Model Canon 9. Finally, the parties dispute whether there is an appearance of impropriety.

## 2. California Rule of Professional Conduct 2-100 Inapplicable

Progressive defendants frame their opposition by citing California cases which hold that *ex parte* communications with former employees not represented by counsel is not a violation of California's ethical rules. See Opp. 10-12, *discussing* Cal. R. Prof. Con. 2-100(B). The situation which confronts the Court presently, however, is something quite different and distinguished on two accounts. First, California courts have only held that *ex parte* communications with former employees are allowable only for *unprivileged* information. See Weil & Brown, *California Practice Guide, Civil Procedure Before Trial* 1 (The Rutter Group), ¶ 1:471.42 (2006) (citing *State Farm Fire & Cas. Co. v. Sup.Ct. (Taylor)* (1997) 54 Cal.App.4th 625, 638, 62 Cal.Rptr.2d 834 (1997). [FN4] As one court noted:

> FN4. Citing to the Rutter Group, Progressive defendant, while citing to a non-existent chapter, left off the last two essential words (unprivileged events).

The knowledge these witnesses have of matters protected by the attorney-client privilege, [and] trade secret agreements ... is so intermingled with knowledge that may be unprotected that the court cannot be assured [defense counsel] or the former employees will be able to segregate out only those matters that may be disclosed. The danger of disclosure of protected information is substantial. There is no sure way of guarding against disclosure if the employees are permitted to work for defendant on this litigation....No matter how well-intentioned counsel and the witnesses may be, the potential for abuse and mischief is great.
*In Re Date Gen. Corp. Antitrust Litigation*, 5 Fed. R. Serv.3d (Callaghan) 510, 9-10 (1986). "The federal courts must be in control of their own proceedings and of the parties before them, and it is almost apodictic that federal sanction law is the body of law to be considered in that regard." *Galam v. Carmel (In re Larry's Apt., L.L.C.)*, 249 F.3d 832, 838 (9th Cir.2001).

Secondly, Burford counsel are not engaging in *ex parte* communications with former employees in order to gain access to unprivileged information. Rather, they have entered into an attorney-client relationship with the former employees. The very nature of that relationship is such that confidences should be exchanged freely between attorney and client. So important is this feature of the relationship, that it gives rise to duties of loyalty and confidentiality. By virtue of this relationship, privileged and confidential information is presumed to be exchanged. Thus, this rule is distinguishable and inapplicable to the case at bar.

### 3. California Rule of Professional Conduct 3-310(C)(1) and (E)

**\*9** Cargill argues that Burford counsel are may be violating Cal. R. Prof. Conduct 3-310(C)(1) which holds: "A member shall not, without the informed written consent of each client [a]ccept representation of more than one client in a matter in which the interests of the clients potentially conflict." While a conflict of interest may arise between the Burford plaintiffs and the Progressive defendants, Cargill does not have standing to assert interests on behalf of either party. Further, Progressive defendants have mention in their declarations that if a conflict arises, Burford counsel will continue representation of Burford plaintiffs only. Thus, this potential has been discussed between those parties and Progressive defendants have shown their understanding of this issue and their consent.

Similarly, Cargill reliance on cases which cite Cal. R. Prof. Conduct 3-310(E) is misplaced. That rule states: "A member shall not, without the informed consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." Burford counsel have never represented Cargill. Cargill can not be identified as either a client or former client. Therefore, this rule can not apply.

In its argument, Cargill attempts to impute the ethical responsibility of an attorney, under Cal. R. Prof'l Conduct 3-310(E), to the Progressive defendants. In opposition, the Progressive defendants argue that the cases upon which Cargill relies expand this rule to "include paralegals, legal secretaries, and others who work as agents of lawyers, when they were hired by opponents.... However, the cases involving non-lawyer support staff diverged over whether the presumption of receipt and disclosure of privileged information was rebuttable or not." Opp., 11:15-18. In order to support this proposition, the Progressive defendants cite *Shandralina G. v. Homonchuk*, 147 Cal.App.4th 395, 408, 54 Cal.Rptr.3d 207 (2007). That case offers this Court guidance on two principles:

Similar concerns arise when a nonlawyer employee of the client's attorney, who obtained confidential information while working for the client's attorney, is later hired by a new attorney, who then undertakes a representation adverse to that client to which the confidential information would be material. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 587588 [283 Cal.Rptr. 732] (Complex Asbestos).) In this context, after it is shown the nonlawyer employee actually obtained confidential information from the former client, the court will presume such information was imparted to the new attorney. Accordingly, the new attorney will be disqualified unless the attorney shows the employee has been adequately screened from involvement in the matter so the confidential information in the employee's possession was not and will not be used or disclosed to the attorney. *Id.* at pp. 592-596, 283 Cal.Rptr. 732.)

...

**\*10** The disqualification principles have also been extended to permit disqualification of an attorney who obtained information protected by the attorney work product privilege. (See *County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647, 657659 [271 Cal.Rptr. 698].) When an attorney consults with an expert and obtains confidential information protected by the work product privilege, and the opposing attorney later acquires the privileged information during communications with that expert, the opposing attorney can be disqualified because, "[h]aving become privy to [the attorney's] work product, there is no way the offending attorney could separate that knowledge from his or her preparation of the case." (*Id.* at pp. 657-658, 271 Cal.Rptr. 698.)

The confidentiality concerns raised in both of these scenarios are similar to the confidentiality scenarios raised in this case by virtue of the confidentiality agreements, repeated and lengthy discussions between Budine and Cargill counsel about *Burford*, all three Progressive defendants' participation in the delivery of documents to Cargill counsel in association with *Burford*, the material divulged by Cargill to the Burford counsel under the Protective Order in *Burford*, and the confidentiality agreements between Cargill and the Progressive defendants, and the nature of this action-which is to protect trade secrets. This will be discussed more fully below.

### 4. Canon 9 as basis for disqualification

With no California rules directly on point, this Court may look to the Model Code. Canon 9 of the

Model Code holds that a "lawyer should avoid even the appearance of professional impropriety." The Ninth Circuit has considered and decided that Canon 9 alone is a sufficient ground for disqualification.

The first issue the court must decide is whether Canon 9 alone can be the basis for a disqualification motion. Strong policy reasons support an affirmative answer. The court is instructed to safeguard the integrity of the judicial process in the eyes of the public....Moreover, Local Rule 1.3(d) of the Central District of California provides that: '... No attorney admitted to practice before this Court shall engaged in any conduct which degrades or impugns the integrity of the Court or ... interferes with the administration of justice therein.' In addition, Local Rule 1.3(d) refers attorneys appearing before the District Court of the Central District of California to the Code of Professional Responsibility as well as the California State Bar Act. If Canon 9 were not separately enforceable, it would be stripped of its meaning and significance ... After carefully reviewing the policy considerations on both sides, we hold Canon 9 alone can be the basis for a disqualification motion.

*In re Coordinated Proc. Petroleum Products Antitrust Lit., 658 F.2d 1355, 1360 (9th Cir.1981)*, *cert. denied,* 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982). Here, all of the same considerations are present. The local rule of the Eastern District of California is identical to that quoted. Further, our local rule refers attorneys to the Model Code. The Progressive defendants argue that the application of Canon 9 is no longer valid, citing *In re McKinney Ranch Associates,* 62 B.R. 249 n. 12 (Bkrtcy.C.D.Cal.1986). This case, however, discusses how the Model Code is no longer in force in that district; yet, the Model Code is still in force in the Eastern District. Even in a district where the local rules no longer cite to the Model Code, the Ninth Circuit recently ruled:

**\*11** Although the ABA Code has been replaced by the ABA Rules of Professional Conduct, which expressly eliminates the 'appearance of impropriety' standard, and although California has neither adopted the ABA Code or Rules nor has its own such standard, the Code and case law illustrates that federal courts have the inherent power to apply it.

*In re AFI Holding, Inc., 355 B.R. 139, 153 n. 15 (B.A.P. 9th Cir.2006)* (internal citations omitted). Therefore, this Court may use Canon 9 of the Model Code as a basis for qualification in this case.

**B. Appearance of Impropriety**
**1. Danger of Dissemination of Privileged and Confidential Information**
It is the duty of this Court, to "guard against the inadvertent use of confidential information." *Ceramco,* 510 F.2d 268, 271.Progressive defendants assert that they were not privy to any privileged information. This assertion is undermined by Budine's high position in Cargill and his repeated interaction and discussions with Cargill's counsel in defense of Burford. This gives rise to, at the very least, a presumption that Budine participated in privileged communications.[FN5] See *Elliot v. McFarland Unified School Dist.,* 165 Cal.App.3d 562, 568-69, 211 Cal.Rptr. 802. The subject of those conversations between Budine and Carpenter, as well as Cargill in-house counsel, was in connection to Cargill's preparation for and defense of the *Burford* case before the Louisiana court. Here, Budine was General Manager of CAN, a high-level manager in control of the group charged with producing the dairy feed at issue in *Burford*. While this area was not originally the subject of the dispute, the plaintiffs in *Burford* have sought class certification, and include at least two dairyman from Budine's area. Budine included an affidavit to that effect in support of Cargill's defense in *Burford*. Cargill further named Budine as a witness in support of Cargill's defense in *Burford*. Any conversations between Budine and Cargill counsel would have been protected by the attorney-client privilege, as they related to the preparation of Cargill's defense in *Burford*. This Court has evidence of at least six conversations to that effect.

FN5. Budine disputes whether the communications between the Cargill's counsel and Budine were the subject of privileged attorney-client privilege. This Court will not, however, further investigate the substance of these conversations. "[T]o require a client to show the nature of the confidential information would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to

be protected by the rule." _Rosenfeld Constr. Co. v. Superior Court,_ 235 Cal.App.3d 566, 573-74, 286 Cal.Rptr. 609 (1991). Instead, a presumption arises that Budine did impart confidential information. _Williams v. Trans World Airlines, Inc.,_ 588 F.Supp. 1037, 1043.

Further, the Court is not persuaded by Progressive plaintiffs' and Burford counsel's proffered arrangement that, while there is no confidential information, Progressive plaintiffs will not relay any confidential information and Burford counsel will shield themselves from any privileged or confidential information. Statements from counsel or former employees to the effect that they "attempted to preserve any attorney-client privilege of the [former employer] while undoubtedly true, are unavailing." _Packard Bell v. NEC v. Aztech Systems Ltd.,_ 2001 U.S. Dist. LEXIS 11194 (C.D.Cal.2001) at *23. Further, "the Court's concern that privileged and confidential information was indeed disclosed and discussed, is not assuaged by [counsel's] assertions to the contrary." _Arnold v. Cargill Inc.,_ 2004 WL 2203410 (D.Minn.2004). Given their "undeniable interest in preserving any tactical advantage they may have garnered," these assertions are unavailing. _MMR/Wallace Power & Industrial Inc. v. Thames Assoc.,_ 764 F.Supp. 712, 726-27 (D.Conn.1991); see also _Cordy v. Sherwin-Williams Co.,_ 156 F.D.R. 575, 584 (D.N.J.1994) ("Self-serving affidavits of counsel and others are not helpful because of their undeniable interest in preserving any tactical advantage they may have garnered); _Biocore Med. Tech., Inc.,_ 181 F.R.D. 660, 675 (D.Kan.1998) ("Self-serving protestations [of counsel] do not help assuage the fears of ... the Court that [the former employee] indeed revealed confidential information."), _aff'd,_ 348 F.3d 1163 (10th Cir.2003).

**\*12** Moreover, such proposed arrangement puts the Progressive defendants in the sole position of determining what is confidential and privileged. Courts have previously refused to allow the former employee to make this decision. See _Saini v. Int'l Game Tech.,_ 434 F.Supp.2d 913 (D.Nev.2006). Indeed, the Progressive defendants in their answer as well as in their memoranda have already made clear to the Court their position that Cargill does not have "any genuine trade secrets regarding the formulations of dairy feed." Mem. Opp., 5. Furthermore, Cargill points out that in his declaration offered for this motion, Budine freely reveals what is considered privileged information at paragraphs 20, 31, and 33. While this information is far from sensitive, it underscores the reality that the Progressive defendants are parties in an adverse proceeding, and therefore not in a position to make a legal finding as they propose to do.

Finally, all Progressive defendants signed confidentiality agreements with Cargill.[FN6] While this Court makes no ruling one way or the other on this issue, Cargill alleges that the Progressive defendants have previously breached those confidentiality agreements. Complaint, ¶¶ 86-97. Agreements of this type, attached to the complaint, are generally recognized in California. Currently, and until this Court makes a finding to the contrary, the agreements are in full force and effect.

> FN6. Cargill entered into an "Employee Confidential Information and Invention" Agreement with Budine and an "Employee Confidential Information, Invention, and Original Works of Authorship Agreement" with Sundberg and Jonkman. Complaint, ¶¶ 87-88.

## 2. Prejudice to Adversaries

"The courts have not only the supervisory power but also the duty and responsibility to disqualify counsel for unethical conduct prejudicial to his adversaries." _Chronometrics, Inc. v. Sysgen, Inc.,_ 110 Cal.App.3d 597, 604, 168 Cal.Rptr. 196 (1980) (discussing and quoting _Ceramco, Inc. v. Lee Pharmaceuticals,_ 510 F.2d 268, 270-71 (2d Cir.1975). Cargill argues that Burford counsel will gain an unfair advantage in this litigation by gaining access to privileged and confidential information not normally available to them through normal discovery means and using it against Cargill. Cargill argues that Burford counsel gained access to 120,000 documents through the _Burford_ litigation through the Protective Order, the majority of which was designated "Confidential" or "Highly Confidential," which is relevant to this case and which may be improperly used against them.

Burford attorneys have access to confidential and highly confidential information obtained through

Burford which they may have been barred from accessing in this case, but may nevertheless be helpful. In this case, the trade secrets at issue are the feed formulations generated through specialized computer software. Cargill claims that the Progressive defendants misappropriated these trade secrets. In connection with *Burford*, Burford counsel received 120,000 documents from Cargill covered in the Protective order, including feed formulations and other "Confidential" and "Highly Confidential" documents. This is exactly the type of information Cargill seeks to keep out of the hands of the Progressive defendants and the information at issue in this case. "Where it can be reasonably said that in the course of the former representation the attorney might have acquired information related to the subject matter of his subsequent representation, it is the court's duty to order the attorney disqualified. The breach of confidence would not have to be proved; it is presumed in order to preserve the spirit of Code [of Professional Conduct, Canon 9]." *Hull v. Celanese Corp., 513 F.2d 568, 572 (2d Cir.1975)* (internal citations omitted). Further, "[c]ase law interpreting what is 'confidential information' initially asks whether the former representation is substantially related to the current representation. Where the substantial relationship has existed, especially where the relationship is such that confidential information normally would have been imparted to the attorney, a 'rule of necessity' causes a presumption of conflict." *Elliott v. McFarland Unified School Dist., 165 Cal.App.3d 562, 568-69, 211 Cal.Rptr. 802*

### 3. Danger of Continuing Adverse Effect

**\*13** Because of the association of Burford counsel and the Progressive defendants in both this and the *Burford* litigation, the dangers of a detrimental continuing effect on this litigation are great. Burford counsel seek a ruling from the Louisiana court that the confidentiality agreements signed between the Progressive defendants and Cargill should not be deemed legally enforceable, so that the Progressive defendants can confer with Burford counsel in that case. Those confidentiality agreements are at issue before this Court in a claim by Cargill against the Progressive defendants. This motion alone shows how the association between Burford counsel and the Progressive defendants creates an atmosphere that is unwieldy for the instant litigation.

Moreover, Cargill argues that the attorney-client relationship that presently exists between the Burford counsel and the Progressive defendants insures that, when Cargill deposes Budine, Sundberg, and Jonkman in connection with *Burford*, it will not be able to learn about the extent of any "improper exchange of information because the attorney-client privilege will be invoked to block such questions. In this fashion, Burford counsel has effectively foreclosed any feasible means of inquiry into its actions." Pl. Reply, 10. This is only one situation of many situations in which the judicial process may become muddled because of this relationship.

As the court noted in *Chronometrics, 110 Cal.App.3d 597, 607, 168 Cal.Rptr. 196*, "[S]uch information as [the attorney] may have learned ... cannot be unlearned ... As counsel, [the attorney] would have the improperly obtained facts instantly available in his mind in questioning witnesses, making and responding to objections and addressing the court and jury."

### 4. Similar Cases Have Resulted in Disqualification

Cargill offers similar cases in which a court properly disqualified counsel. In *Packard Bell, supra*, 2001 U.S. Dist. LEXIS 11194, the Central District of California relied on Canon 9 and California Rule of Professional Conduct 3-310(c)(1) to disqualify counsel on facts strikingly similar to those here. In seeking qualification, Packard Bell alleged that because of the law firm's concurrent representation of the party opposing it in another litigation with a former Packard Bell employee, the attorney was "likely to obtain confidential information that it could not lawfully obtain in discovery." *Id.* at \*14. As stated by the court, "it is the potential for disclosure of confidential information in light of the status of the [lawyer representing both plaintiff and former employee defendant] which is the concern. *Id* at \*23. Under similar facts, the former employee's responsibilities included supervision and direction of the business that was the subject of the other litigation, which led that former employee to have discussion with Packard Bell counsel about litigation strategy. In disqualifying the law firm, the court reasoned that while privileged and confidential information "cannot be unlearned, and the lawyer who obtained the information cannot be prevented from giving it to others, disqualification still serves the useful purpose of eliminating from the case the attorney who could most effectively exploit the unfair advantage." *Id* at \*25.

**\*14** In *Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037 (W.D.Mo.1984), counsel was disqualified in a discrimination action against TWA, because counsel concurrently represented a former employee of TWA who had access to confidential information while employed at TWA. Progressive defendants seek to distinguish this case, because the former employee participated extensively in the preparation of the litigation of Williams. Here, Progressive defendants have also had contacts with counsel, and even prepared affidavits in relation to proposed members of the Burford plaintiff class. Thus, the evidence strongly suggests the Progressive defendants did help prepare in that litigation. Further, they have all signed confidentiality agreements with Cargill. In *Williams,* despite the fact that the former TWA employee had not signed a confidentiality agreement, stated that she had no specific recollection of the Williams action, and had no confidential documents in her possession, the Court held

the fairness and integrity of the judicial process and TWA's legitimate interest in a trial free from the risk that confidential information has been unfairly used against it outweighs plaintiffs' interest in being represented by this particular law firm. To refuse to disqualify [plaintiff's counsel] would leave an appearance of impropriety hanging over these cases which would taint the proceedings. *Id.* at 1040, 1046.

## C. Disqualification Proper

In the instant case, there is divergence from the more usual situation of the lawyer who switches sides to represent an interest adverse to a former client. Instead, we have a former executive whose work was the subject of a substantially related case and who participated in preparation of defense in that case, who switched sides to assist plaintiffs in that case, and further entered into a separate lawsuit against the former employer. In spite of this, Burford counsel seeks to represent both the Burford plaintiffs and Progressive defendants.

It is undisputed that the Progressive defendant's right to counsel of their choice is important. However, in similar situations, that right has yielded to considerations of ethics and the integrity of the judicial process. See *Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir.1975). The "potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process." *Williams,* 588 F.Supp. 1037, 1045 (citing *NKC Org. Ltd. v. Bregman,* 542 F.2d 128, 132 (2d Cir.1976) (holding that Appellant's interest must yield in the balance and doubts be resolved in favor of disqualification for the adequate protection of these other interests under Canon 9 of the Model Code). The Court generally will defer to a party's choice of counsel. In this case, however, the policy concerns raised by participation of Burford counsel outweigh this right; namely, the appearance of impropriety and the threat to the integrity of the trial process, because of the confidential and privileged information involved, and the risk of unfair advantage. The arrangement impugns the integrity of these judicial proceedings, the integrity of this Court, and the administration of justice. The Progressive defendants describe their interest in keeping Burford counsel as their expertise in Cargill cases and Burford counsel's willingness to work on a contingency fee basis. These interests do not excuse or explain away the conflict that exists.

### V. Conclusion

**\*15** For the foregoing reasons, this Court ORDERS:

I. Plaintiffs' motion for disqualification of Burford counsel is GRANTED; and

II. The hearing currently set for June 27, 2007 is VACATED.

IT IS SO ORDERED.

E.D.Cal.,2007.
Cargill Inc. v. Budine
Not Reported in F.Supp.2d, 2007 WL 1813762 (E.D.Cal.)

Motions, Pleadings and Filings (Back to top)

- <u>2008 WL 5650350</u> (Jury Instruction) Jury Instructions (Oct. 8, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 5650349</u> (Trial Motion, Memorandum and Affidavit) Defendants/Counter-Claimants Memorandum of Points and Authorities in Opposition to Plaintiffs/Counterclaim Defendants' Motion for New Trial (Oct. 6, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 5650348</u> (Trial Motion, Memorandum and Affidavit) Cargill's Motion for New Trial (Sep. 22, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296071</u> (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Cargill's Motion for Judgment On Progressive's Unfair Competition Claim (Aug. 25, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296070</u> (Trial Motion, Memorandum and Affidavit) Matthew Budine, Luciana Jonkman, Brian Sundberg, and Progressive Dairy Solutions, Inc.'s Brief On California Business and Professions Code Section 17200 (Aug. 18, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4093134</u> (Verdict and Settlement Summary) (Aug. 14, 2008)
- <u>2008 WL 4296068</u> (Trial Motion, Memorandum and Affidavit) Motion for Judgment As a Matter of Law On Progressive's Unfair Competition Claim (Aug. 14, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296069</u> (Verdict, Agreement and Settlement) Verdict (Aug. 14, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296067</u> (Trial Motion, Memorandum and Affidavit) Plaintiffs and Counterclaim Defendants Cargill, Incorporated and can Technologies, Inc.'s Reply to Defendants' Brief On Jury Instructions Regarding Noneconomic Damages (Jul. 24, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296061</u> (Trial Motion, Memorandum and Affidavit) Plaintiffs and Counterclaim Defendants Cargill, Incorporated and can Technologies, Inc.'s Objections to Defendants Proposed Jury Instructions (Jul. 23, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296062</u> (Trial Motion, Memorandum and Affidavit) Defendants/Cross-Complaints Matthew Budine, Luciana Jonkman, Brian Sundberg, and Progressive Dairy Solutions, Inc.'s Written Objections to Cargill's Exhibits (Jul. 23, 2008) <u>Original Image of this Document with Appendix (PDF)</u>
- <u>2008 WL 4296063</u> (Trial Motion, Memorandum and Affidavit) Plaintiffs and Counterclaim Defendants Cargill, Incorporated and can Technologies, Inc.'s Objections to Defendants' Deposition Designations (Jul. 23, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296064</u> (Trial Motion, Memorandum and Affidavit) Defendants/counter-Claimants Matthew Budine, Luciana Jonkman, Brian Sundberg and Progressive Dairy Solutions, Inc.'s Objctions to Plaintiffs/counter-Defendants' Proposed Jury Instrucions (Jul. 23, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296065</u> (Trial Motion, Memorandum and Affidavit) Plaintiffs and Counterclaim Defendants Cargill, Incorporated and can Technologies, Inc.'s Objections to Defendants' Trial Exhibits (Jul. 23, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296066</u> (Trial Motion, Memorandum and Affidavit) Cargill's Motion to Strike Portions of Certain Demonstratives Prepared By Progressive (Jul. 23, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296059</u> (Trial Motion, Memorandum and Affidavit) Defendants/ Counter-Claimants Matthew Budine, Luciana Jonkman, Brian Sundberg and Progressive Dairy Solutions, Inc.'s, Trial Brief (Jul. 22, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4296060</u> (Trial Motion, Memorandum and Affidavit) Plaintiffs and Counterclaim Defendants Cargill, Incorporated and can Technologies, Inc.'s Trial Brief (Jul. 22, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4262571</u> (Jury Instruction) Proposed Jury Instructions By Defendants/counter-Claimants Matthew Budine, Brian Sundberg, Luciana Jonkman, and Progressive Dairy Solutions, Inc. (Jul. 21, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4262572</u> (Jury Instruction) (proposed) Jury Instructions By Defendants/counter-Claimants Matthew Budine, Brian Sundberg, Luciana Jonkman, and Progressive Dairy Solutions, Inc. (clean Copy)) (Jul. 21, 2008) <u>Original Image of this Document (PDF)</u>
- <u>2008 WL 4262573</u> (Jury Instruction) (proposed) Jury Instructions Submitted Jointly By Plaintiffs

Cargill Incorporated and can Technologies, Inc., and Defendants/Counter Claimants Matthew Budine, Brian Sundberg, Luciana Jonkman, and Progressive Dairy Solutions, Inc. (Jul. 21, 2008) Original Image of this Document (PDF)

• 2008 WL 4262574 (Jury Instruction) Plaintiffs and Counterclaim Defendants Cargill, Incorporated and can Technologies, Inc.'s Proposed Jury Instructions (Jul. 21, 2008) Original Image of this Document (PDF)

• 2008 WL 4262575 (Jury Instruction) Plaintffs and Counterclaim Defendants Cargill, Incorporated and can Technologies, Inc. Proposed Jury Instructions (clean) (Jul. 21, 2008) Original Image of this Document (PDF)

• 2008 WL 4296058 (Trial Motion, Memorandum and Affidavit) Progressive's Rebuttal to Cargill's Opposition to Progressive Motion in Limine No. Testimony Regarding Attorney Client Communications (Jul. 17, 2008) Original Image of this Document (PDF)

• 2008 WL 4296054 (Trial Motion, Memorandum and Affidavit) Defendants/Counter-Claimants Opposition to Motion in Limine No. 4 to Exclude Testimony of Jon D. Robison Pursuant to Daubert (Jul. 11, 2008) Original Image of this Document with Appendix (PDF)

• 2008 WL 4296055 (Trial Motion, Memorandum and Affidavit) Progressive's Opposition to Cargill's Motion in Limine No. 3 - Motion to Exclude All Reference to Cargill's Alleged Threats to Suppliers (Jul. 11, 2008) Original Image of this Document (PDF)

• 2008 WL 4296056 (Trial Motion, Memorandum and Affidavit) Progressive's Opposition to Cargill's Motion in Limine No. 8-Motion to Preclude Defendants from Referring to Their Statutory Unfair Competition Counterclaim in the Jury's Presence (Jul. 11, 2008) Original Image of this Document (PDF)

• 2008 WL 4296057 (Trial Motion, Memorandum and Affidavit) Cargill's Opposition to Progressive's Motions in Limine (Jul. 11, 2008) Original Image of this Document (PDF)

• 2008 WL 4296052 (Trial Motion, Memorandum and Affidavit) Motion to Exclude Evidence Relating to the Earnings of Cargill's Worldwide Operations and to Strike Progressive's Claim for Punitive Damages (Jul. 7, 2008) Original Image of this Document (PDF)

• 2008 WL 4296044 (Trial Motion, Memorandum and Affidavit) Defendants/counter-Claimants Matthew Budine, Brian Sundberg, Lucian Jonkman and Progressive Dairy Solutions, Inc.'s Motions in Limine (Jul. 2, 2008) Original Image of this Document (PDF)

• 2008 WL 4296046 (Trial Motion, Memorandum and Affidavit) Motion to Exclude All Reference to Cargill's Alleged Threats to Suppliers (Jul. 2, 2008) Original Image of this Document (PDF)

• 2008 WL 4296048 (Trial Motion, Memorandum and Affidavit) Motion to Exclude Evidence Relating to the Burford or Acme Lawsuits (Jul. 2, 2008) Original Image of this Document (PDF)

• 2008 WL 4296049 (Trial Motion, Memorandum and Affidavit) Cargill's Motion in Limine No. 6 Motion to Preclude Progressive from Basing Liability or Damages At Trial On the Filing of Cargill's Lawsuit (Jul. 2, 2008) Original Image of this Document (PDF)

• 2008 WL 4296050 (Trial Motion, Memorandum and Affidavit) Cargill's Motion in Limine No.7 Motion to Exclude Testimony of Certain Progressive Witnesses As Irrelevant (Jul. 2, 2008) Original Image of this Document (PDF)

• 2008 WL 4296051 (Trial Motion, Memorandum and Affidavit) Cargill's Motion in Limine No. 10: Motion to Exclude the Testimony of Undisclosed Witnesses (Jul. 2, 2008) Original Image of this Document (PDF)

• 2008 WL 4185436 (Partial Expert Testimony) Deposition of Jon Robison Palo Alto, California (Jun. 16, 2008)

• 2008 WL 2817321 (Trial Motion, Memorandum and Affidavit) Defendant/Counterclaimants Matthew Budine, Luciana Jonkman, Brian Sundberg, and Progressive Dairy Solutions, Inc.'s Opposition to Plaintiffs' Administrative Motion for Miscellaneous Relief Under the Protective Order (Jun. 4, 2008) Original Image of this Document (PDF)

• 2008 WL 2817320 (Trial Filing) Joint Pretrial Statement (Jun. 3, 2008) Original Image of this Document (PDF)

• 2008 WL 4185434 (Partial Expert Testimony) Deposition of Timothy J. Nantell (Jun. 3, 2008)

• 2008 WL 4185435 (Partial Expert Testimony) Deposition of Keith W. Kinsel (Jun. 3, 2008)

• 2008 WL 4185433 (Expert Report and Affidavit) Rebuttal Expert Report of Mark Wustenberg, D.V.M.

(Apr. 21, 2008) Original Image of this Document (PDF)
• 2007 WL 2973351 (Trial Motion, Memorandum and Affidavit) Plaintiff's Cargill, Incorporated and Can Technologies, Inc.'s Reply in Support of Its Motion to Dismiss Defendants Progressive Dairy Solutions, Inc., Matthew Budine, Luciana Jonkman and Brian Sundberg's Sherman Act Counterclaims (Aug. 21, 2007)
• 2007 WL 2973350 (Trial Motion, Memorandum and Affidavit) Defendants Progressive Dairy Solutions, Inc., Matthew Budine, Luciana Jonkman and Brian Sundberg's Opposition to Plaintiff Cargill Incorporated's Motion to Dismiss Defendants' Sherman Act Counterclaims (Aug. 14, 2007)
• 2007 WL 6048595 (Trial Motion, Memorandum and Affidavit) Plaintiffs Cargill Incorporated and can Technologies, Inc.'s Memorandum in Support of Its Motion to Dismiss Defendants Progressive Dairy Solutions, Inc., Matthew Budine, Luciana Jonkman and Brian Sundberg's Sherman Act Counterclaims (Jul. 27, 2007) Original Image of this Document (PDF)
• 2007 WL 6048599 (Verdict, Agreement and Settlement) Stipulated Dismissal of Defendant Todd Charles Schwegel with Prejudice (F.R.C.P. 41(a)(1)) (Jun. 6, 2007) Original Image of this Document (PDF)
• 2007 WL 6048598 (Trial Filing) Joint Rule 26(f) Report (May 15, 2007) Original Image of this Document (PDF)
• 2007 WL 6048596 (Trial Pleading) Complaint for (1) Misappropriation of Trade Secrets (Civil Code | 3426 Et Seq.); (2) Breach of Contract; (3) Common Law Unfair Competition; (4) Violation of Prof. & Bus. Code |17200; (5) Conversion; (6) Fraud; (7) Negligent Misrepresentation; (8) Int entional Interference with Prospective Business Relationship; (9) Breach of Duty of Good Faith and Fair Dealing; (10) Breach of Duty of Loyalty (Labor Code | 2863); (11) Breach of Fiduciary Duty; (12) Defamation; (13) Unjust Enrichment; and (14) Civi (Mar. 1, 2007) Original Image of this Document (PDF)
• 2007 WL 6048597 (Trial Motion, Memorandum and Affidavit) Brief in Support of Plaintiffs' Ex Parte Motion for Temporary Restraining Order to Prevent Destruction of Evidence and Requiring Imaging of Electronic Media to Preserve Evidence (Mar. 1, 2007) Original Image of this Document (PDF)
• 1:07cv00349 (Docket) (Mar. 1, 2007)

Trial Transcripts with Streaming Media (Back to top)

• 2008 WL 5739330 (Trial Transcript) Reading of the Verdict (Aug. 14, 2008) Original Image of this Document (PDF)
• 2008 WL 5739327 (Trial Transcript) Judge's Instructions/Charge to the Jury (Aug. 13, 2008) Original Image of this Document (PDF)
• 2008 WL 5739328 (Trial Transcript) Plaintiff Cargill, Incorporated, et al.'s Closing Statement (Aug. 13, 2008) Original Image of this Document (PDF)
• 2008 WL 5739329 (Trial Transcript) Defendant Progressive, Incorporated, et al.'s Closing Statement and Plaintiff's Rebuttal (Aug. 13, 2008) Original Image of this Document (PDF)
• 2008 WL 5739324 (Trial Transcript) Hearing on Plaintiff Cargill, Incorporated, et al.'s Motion for Reconsideration (Aug. 12, 2008) Original Image of this Document (PDF)
• 2008 WL 5739325 (Trial Transcript) Testimony of Defendant's Witness, Luciana Jonkman (Aug. 12, 2008) Original Image of this Document (PDF)
• 2008 WL 5739326 (Trial Transcript) Testimony of Defendant's Witness, Matthew Budine (Aug. 12, 2008) Original Image of this Document (PDF)
• 2008 WL 5693985 (Expert Trial Transcript) Testimony of Plaintiff's Expert Witness, Jon Robison (Aug. 11, 2008)
• 2008 WL 5739322 (Trial Transcript) Hearing on Plaintiff Cargill, Incorporated, et al.'s Motion in Limine (Aug. 11, 2008) Original Image of this Document (PDF)
• 2008 WL 5739323 (Trial Transcript) Hearing on Progressive, Incorporated, et al.'s Motion in Limine (Aug. 11, 2008) Original Image of this Document (PDF)
• 2008 WL 5739312 (Trial Transcript) Testimony of Defendant's Witness, Michael Watson (Aug. 7, 2008) Original Image of this Document (PDF)
• 2008 WL 5739313 (Trial Transcript) Testimony of Defendant's Witness, Brian Sundberg (Aug. 7,

2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5693984 (Expert Trial Transcript) Testimony of Plaintiff's Expert Witness, Timothy Nantell, Ph.D. (Aug. 6, 2008)
- 2008 WL 5739311 (Trial Transcript) Testimony of Defendant's Witness, Richie Helda (Aug. 6, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5693983 (Expert Trial Transcript) Testimony of Plaintiff's Expert Witness, Robert Lelewski (Aug. 5, 2008)
- 2008 WL 5739310 (Trial Transcript) Testimony of Plaintiff's Witness, Chuck Warta (Aug. 5, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739307 (Trial Transcript) Testimony of Plaintiff's Witness, Robert Schubert. Reading of the Deposition (Aug. 4, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739308 (Trial Transcript) Testimony of Plaintiff's Witness, Robert Sheffer (Aug. 4, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739309 (Trial Transcript) Hearing on Defendant Progressive Dairy Solutions, Inc., et al.'s Motion in Limine (Aug. 4, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739316 (Trial Transcript) Testimony of Plaintiff's Witness, Janice McCord (Jul. 31, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739317 (Trial Transcript) Testimony of Plaintiff's Witness, Douglas DeGroff (Jul. 31, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739318 (Trial Transcript) Testimony of Plaintiffs Witness, Logan Johnson (Jul. 30, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739319 (Trial Transcript) Testimony of Plaintiffs Witness, Mike Jarred (Jul. 30, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739320 (Trial Transcript) Testimony of Plaintiffs Witness, Todd Schwegel (Jul. 30, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739321 (Trial Transcript) Testimony of Plaintiffs Witness, Todd Hall (Jul. 29, 2008) ▦ Original Image of this Document (PDF)
- 2008 WL 5739314 (Trial Transcript) Plaintiff Cargill, Incorporated, et al.'s Opening Statement (Jul. 28, 2008)
- 2008 WL 5739315 (Trial Transcript) Defendant Progressive Dairy Solutions, Inc., et al.'s Opening Statement (Jul. 28, 2008) ▦ Original Image of this Document (PDF)
END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Condux Intern., Inc. v. Haugum**
Not Reported in F.Supp.2d, 2008 WL 5244818
D.Minn.,2008.
December 15, 2008 (Approx. 8 pages)

Not Reported in F.Supp.2d, 2008 WL 5244818 (D.Minn.)

<u>Motions, Pleadings and Filings</u>
Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
CONDUX INTERNATIONAL, INC., Plaintiff,
v.
John HAUGUM, Defendant.

Civil No. 08-4824 ADM/JSM.
Dec. 15, 2008.

West KeySummary

<u>372</u> Telecommunications
   372VIII Computer Communications
     <u>372k1339</u> Civil Liabilities; Illegal or Improper Purposes
      <u>372k1342</u> k. Fraud; Unauthorized Access or Transmission. <u>Most Cited Cases</u>

    An employer failed to allege sufficient facts to support its Computer Fraud and Abuse Act claim against a former employee who misappropriated confidential business information in order to start a competing business. The employer failed to allege that the employee accessed the computers either without authorization or in excess of authorized access. The employee was authorized, as vice president of global sales, to access the computers, regardless of how he later misused the information obtained. <u>18 U.S.C.A. § 1030.</u>

<u>Joseph M. Sokolowski</u>, Fredrikson & Byron, PA, Minneapolis, MN, argued on behalf of Plaintiff.

<u>Ryan B. Magnus</u>, Zack, Jones and Magnus, Mankato, MN, argued on behalf of Defendant.

**MEMORANDUM OPINION AND ORDER**
<u>ANN D. MONTGOMERY</u>, District Judge.

**I. INTRODUCTION**
   ***1** On November 6, 2008, the undersigned United States District Judge heard oral argument on Defendant John Haugum's ("Haugum") Motion to Dismiss [Docket No. 5]. In its Amended Complaint [Docket No.7], Plaintiff Condux International, Inc. ("Condux") asserts a claim under the Computer Fraud and Abuse Act ("CFAA"), <u>18 U.S.C. § 1030</u>, as well as state law claims for breach of fiduciary duty, misappropriation of trade secrets, misappropriation of confidential information, and unfair competition. For the reasons set forth below, Haugum's Motion is granted.

**II. BACKGROUND**<u>FN1</u>

    <u>FN1.</u> In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. <u>Hamm v. Groose</u>, 15 F.3d 110, 112 (8th Cir.1994).

   Condux, a Minnesota corporation with its principal place of business in Mankato, Minnesota, manufactures and installs tools and equipment used in the electrical utility, electrical contracting, telecommunications, and cable television industries. Am. Compl. ¶ 1. Haugum, a resident of Mankato,

Minnesota, worked for Condux in a variety of positions, most recently as the Vice President of Global Sales. *Id.* ¶¶ 1, 5. As vice president, Haugum was responsible for overseeing sales and marketing for the company, and accordingly, was authorized to access "confidential business information" (such as Condux's customer lists, pricing and sales data, profit-margin data, and engineering drawings of Condux's products) stored on Condux's computer system. *Id.* ¶¶ 5-7. Condux's employee handbook provides that confidential business information owned by Condux is not to be misappropriated by employees for their own personal benefit. *Id.* ¶ 9.

In November 2007, Haugum exchanged emails with a former Condux employee indicating that Haugum was considering quitting his job at Condux and starting his own competing business. *Id.* ¶ 10. Condux alleges that in December 2007, Haugum requested that an employee in Condux's information technology department send him an electronic list of Condux's customers and their contact information. *Id.* ¶ 11. Also, Condux asserts, Haugum downloaded over forty engineering drawings from Condux's computer system in January 2008. *Id.* ¶ 12. Soon thereafter, Haugum announced his resignation and left Condux on February 15, 2008. *Id.* ¶ 13.

Condux asserts that since Hagum's departure, it has learned that Haugum "attempted to delete evidence of his download of the engineering drawings" and discovered a document drafted by Haugum that included a resolution to develop a business to compete with Condux. *Id.* ¶ 14. Condux alleges further that Haugum has (1) approached one of Condux's distributors about doing business directly with Haugum; (2) exchanged emails with a former Condux employee in May 2008 in which the former employee agreed to send Condux's confidential business information to Haugum; and (3) "directed" the former employee to delete evidence of those emails and the accompanying transfer of confidential business information. *Id.* ¶¶ 15-17, 25-26. Condux claims that Haugum's activities in obtaining the confidential business information were wrongful, that Haugum misappropriated the confidential business information for his own benefit in competition with Condux, and that Condux has suffered damages as a result. *Id.* ¶¶ 23-25, 28, 31-33.

## III. DISCUSSION

### A. Motion to Dismiss Standard

*2 Haugum argues that Condux's claim under the CFAA must be dismissed for failure to state a claim on which relief can be granted. Consequently, Haugum argues, Condux's related state law claims must also be dismissed because, without the CFAA claim, supplemental jurisdiction to consider the state law claims is lacking.

In considering a motion to dismiss under Rules 12(b)(1) and 12(b)(6), courts must construe the pleadings in the light most favorable to the nonmoving party and view the facts alleged in the complaint as true. *Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir.1994); *Ossman v. Diana Corp.*, 825 F.Supp. 870, 879-80 (D.Minn.1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. *Ossman*, 825 F.Supp. at 880. "A motion to dismiss should be granted as a practical matter ... only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995). Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain a short and plain statement of the claim showing that the pleader is entitled to relief." A pleading must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

### B. CFAA Claim

Count One of the Amended Complaint alleges that Haugum's activities in obtaining the confidential business information, using that information to compete with Condux, and attempting to delete evidence on Condux's computer system showing that he had obtained the confidential business information constituted violations of 18 U.S.C. § 1030. Am. Compl. ¶¶ 19-30. Specifically, Condux claims that Haugum violated subsections (a)(2), (a)(4), and (a)(5)(A) of § 1030. *See* Pl.'s Mem. in Opp'n to Mot. to Dismiss [Docket No. 11] at 6.

The CFAA provides criminal liability for any one of seven prohibited activities, which, broadly speaking, involve computer hacking. *See* 18 U.S.C. § 1030(a)(1)-(7). Although the CFAA is primarily a criminal statute, § 1030(g) provides:

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B).

Courts have found the CFAA authorizes a civil cause of action for violations of specific substantive provisions in § 1030(a). *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1156 (5th Cir.2006); *see also P.C. Yonkers, Inc. v. Celebrations! The Party & Seasonal Superstore, LLC*, 428 F.3d 504, 511 (3d Cir.2005) (holding that § 1030(g) authorizes civil causes of action); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir.2003) (holding that § 1030(g) creates a civil remedy for any person who suffers damage or loss due to a violation of the CFAA).

   **\*3** As an initial matter, Haugum argues that the second sentence in § 1030(g) expressly limits civil actions under the CFAA to violations of subsection (a)(5) of § 1030. Therefore, Haugum maintains, to the extent that Condux's CFAA claim is based on violations of subsections (a)(2) and (a)(4) of § 1030, those portions of his claim must be dismissed. In support, Haugum cites two decisions from this district holding that civil actions under the CFAA cannot be based on violations of subsections other than subsection (a)(5). *See Cenveo Corp. v. Celumsolutions Software GMBH & Co. KG*, 504 F.Supp.2d 574, 580 (D.Minn.2007); *McLean v. Mortgage One & Finance Corp.*, No. Civ. 04-1158, 2004 WL 898440, at \*2 (D.Minn.2004). Condux responds that *Cenveo* and *McLean* were wrongly decided and that "the CFAA permits civil actions to be brought not only under subsection (a)(5), but also under subsections (a)(2) and (a)(4)." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 7. While a civil action must allege conduct that involves one of the five factors in subsection (a)(5)(B), Condux explains, "nowhere does the statute limit civil actions to only the conduct listed under subsection (a)(5)(A)." *Id.* at 8.

   Although the Eighth Circuit has yet to address the issue of which violations of the CFAA may support a civil action, other circuit courts have held that civil actions under the CFAA can be based on a violation of any of the subsections of § 1030(a). *See Fiber Sys.*, 470 F.3d at 1156-57 (rejecting the argument that § 1030(g) authorizes civil actions only for violations of subsection (a)(5) as being "at odds with the language of the statute" and holding that the CFAA authorizes a civil action for violations of the other subsections of § 1030(a), so long as one of the five factors in subsection (a)(5) is "involved"); *P.C. Yonkers*, 428 F.3d at 512-13 ("We do not read [§ 1030(g) ] ... as limiting relief to claims that are entirely based only on subsection (a)(5), but, rather, as requiring that claims brought under other [sub]sections must meet, in addition, one of the five number (a)(5)(B) 'tests.' "); *Theofel*, 359 F.3d at 1078 n. 5 (holding that § 1030(g) "applies to any violation of 'this section' and, while the offense must involve one of the five factors in (a)(5)(B), it need not be one of the three offenses in (a)(5)(A)"). The Court recognizes that these circuit court decisions appear to conflict with the decisions in *Cenveo* and *McLean*. However, the apparent conflict in the case law need not be resolved here. Even assuming that the CFAA authorizes civil actions for violations of any of the subsections in § 1030(a), Condux has failed to allege sufficient facts to support its CFAA claim for violations of subsections (a)(2), (a)(4), and (a)(5)(A).

## 1. Alleged Violations of Subsections (a)(2), (a)(4), and (a)(5)(A)(ii) and (iii)

   A violation of subsection (a)(2)(C) [FN2] occurs when a person intentionally accesses a computer without authorization or in excess of authorized access and thereby obtains information from a "protected computer if the conduct involved an interstate or foreign communication." 18 U.S.C. § 1030(a)(2)(C). Subsection (a)(4) is violated if a person knowingly and with intent to defraud, accesses a protected computer without authorization or in excess of authorized access and by means of such conduct obtains anything of value. 18 U.S.C. § 1030(a)(4). And a violation of subsection (a)(5)(A) occurs when a person intentionally accesses a protected computer without authorization and as a result of such conduct causes or recklessly causes damage. 18 U.S.C. § 1030(a)(5)(A)(ii)-(iii). Thus, violations of subsections (a)(2) and (a)(4) require allegations that Haugum accessed Condux's computers either *without authorization or in excess of authorized access,* while violations of subsection (a)(5)(A)(ii) and (iii) require an allegation that Haugum accessed a protected computer *without authorization.*

FN2. Because there is nothing to suggest that the facts here involve computer information obtained from a financial institution, card issuer, consumer reporting agency, or department or agency of the United States, subparagraphs (A) and (B) of subsection (a)(2) are not applicable. *See* 18 U.S.C. § 1030(a)(2).

**\*4** Haugum argues his position as vice president "authorized" him to access Condux's computer system and specifically to access the confidential business information and, therefore, Condux is unable to allege that he acted without authorization or in excess of authorized access. Def.'s Mem. in Supp. of Mot. to Dismiss [Docket No. 9] at 6-7. Condux does not dispute that Haugum was permitted to access the confidential business information; instead, Condux contends that Haugum was without authorization or exceeded his authorized access because he was "never authorized ... to access its computer system to misappropriate confidential business information for his personal competitive use." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 12. In other words, Haugum was without authorization or exceeded his authorized access because of his wrongful intended use of the confidential business information.

The dispute regarding the proper interpretation of the terms "without authorization" and "exceeds authorized access" has been addressed by courts in other jurisdictions, and the courts have split on the question of whether an employee with an improper purpose may be held civilly liable under the CFAA for accessing computer information that he is otherwise permitted to access within the scope of his employment. Several courts (hereinafter referred to as the " *Shurgard/Citrin* line of cases") have agreed with Condux and have concluded that an employee may act "without authorization" or "in excess of authorized access" when he accesses confidential or proprietary business information from his employer's computers that he has permission to access but then uses that information in a manner that is inconsistent with the employer's interests or in violation of contractual obligations or fiduciary duties.<u>FN3</u> Other courts (hereinafter referred to as the " *Lockheed* line of cases") have adopted a much narrower interpretation and have held that the CFAA is implicated only by the unauthorized access, obtainment, or alteration of information, not the misuse or misappropriation of information obtained with permission.<u>FN4</u> For the reasons discussed below, the Court concludes that the *Lockheed* line of cases reflects a more correct interpretation of the meaning of the terms "without authorization" and "exceeds authorized access."

FN3. *See, e.g., Int'l Airport Ctrs., L.L.C. v. Citrin,* 440 F.3d 418, 420-21 (7th Cir.2006); *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 582-84 (1st Cir.2001); *ViChip Corp. v. Lee,* 438 F.Supp.2d 1087, 1100 (N.D.Cal.2006); *Pac. Aerospace & Elec., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195-97 (E.D.Wash.2003); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1125 (W.D.Wash.2000); *see also Calyon v. Mizuho Sec. USA, Inc.,* No. 07 Civ. 2241, 2007 WL 2618658, at \*1 (S.D.N.Y. July 24, 2007); *Pharmerica, Inc. v. Arledge,* No. 8:07-cv-486-T-26MAP, 2007 WL 865510, at \*7-8 (M.D.Fla. Mar.21, 2007); *Int'l Sec. Mgmt. Group, Inc. v. Sawyer,* No. 3:06CV0456, 2006 WL 1638537, at \*20-21 (M.D.Tenn. June 6, 2006); *Nilfisk-Advance, Inc. v. Mitchell,* No. 05-5179, 2006 WL 827073, at \*2 (W.D.Ark. Mar.28, 2006); *HUB Group, Inc. v. Clancy,* No. 05-2046, 2006 WL 208684, at \*3-4 (E.D.Pa. Jan.25, 2006).

FN4. *See, e.g., Black & Decker (US), Inc. v. Smith,* 568 F.Supp.2d 929, 933 (W.D.Tenn.2008); *Shamrock Foods Co. v. Gast,* 535 F.Supp.2d 962, 964 (D.Ariz.2008); *Diamond Power Int'l, Inc. v. Davidson,* 540 F.Supp.2d 1322, 1341-43 (N.D.Ga.2007); *B & B Microscopes v. Armogida,* 532 F.Supp.2d 744, 758 (W.D.Pa.2007); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda,* 390 F.Supp.2d 479, 498-99 (D.Md.2005); *SecureInfo Corp. v. Telos Corp.,* 387 F.Supp.2d 593,608-10 (E.D.Va.2005); *In re America Online, Inc. Version 5.0 Software Litig.,* 168 F.Supp.2d 1359, 1370-71 (S.D.Fla.2001); *see also Brett Senior & Assocs., P.C. v. Fitzgerald,* No. 06-1412, 2007 WL 2043377, at \*4 (E.D.Pa. July 13, 2007); *Lockheed Martin Corp. v. Speed,* No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at \*5 (M.D.Fla. Aug.1, 2006).

As with any question of statutory interpretation, a court's starting point is the statute's plain language. _Watson v. Ray,_ 192 F.3d 1153, 1155 (8th Cir.1999). The CFAA defines "exceeds authorized access" as "access[ing] a computer with authorization and [using] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030 (e)(6). The plain language contemplates persons who "go beyond the permitted access granted to them-typically insiders exceeding whatever access is permitted to them." _Lockheed Martin,_ 2006 WL 2683058, at * 5; _see also Black & Decker,_ 568 F.Supp.2d at 935. By contrast, "without authorization" is not defined in the CFAA, but " 'authorization' is commonly understood as '[t]he act of conferring authority; permission.' " _Lockheed Martin,_ 2006 WL 2683058, at * 5 (quoting The American Heritage Dictionary 89 (1976)); _see also Shamrock Foods,_ 535 F.Supp.2d at 965. "[W]ithout authorization" refers to persons "below authorization, meaning those having no permission to access whatsoever." _Lockheed Martin,_ 2006 WL 2683058, at * 5.

**\*5** Relying on these understandings of the plain meaning of "exceeds authorized access" and "without authorization," the court in _Diamond Power_ explained that both of the terms depend not on the "unauthorized _use of information,_ but rather upon the ... unauthorized _use of access."_ 540 F.Supp.2d at 1343 (emphasis added). The interpretation advanced by Condux and articulated in the _Shurgard/Citrin_ line of cases incorrectly focuses on what a defendant did with the information after he accessed it (use of information), rather than on the appropriate question of whether he was permitted to access the information in the first place (use of access). As one court explained, "this interpretation reads section (a)(4) as if it said 'exceeds authorized use' instead of 'exceeds authorized access.' " _Brett Senior,_ 2007 WL 2043377, at \*4. Had Congress intended to target how a person makes use of information, it would have explicitly provided language to that effect. Indeed, one need look no further than to another subsection of § 1030 to see such explicit language that targets a person's use of information. _See_ 18 U.S.C. § 1030(a)(1) (prohibiting the access without authorization or in excess of authorized access and subsequent "communicat[ion], deliver[y], or transmi [ssion]" of certain information.) Thus,"the plain language of [subsections (a)(2), (a)(4), and (a)(5)(A)(ii) and (iii) ] target 'unauthorized procurement or alteration of information, not its misuse or misappropriation.' " _Shamrock Foods,_ 535 F.Supp.2d at 965 (quoting _Brett Senior,_ 2007 WL 2043377, at \*3).

The legislative history of the CFAA supports this interpretation, which focuses on the propriety of the access of information rather than on the propriety of the use of information. The 1984 House Committee explained that the conduct prohibited by the CFAA is "analogous to that of 'breaking and entering' rather than using a computer ... in committing the offense." H.R.Rep. No. 98-894, at 20 (1984). In 1986, Congress amended the CFAA to substitute the term "exceeds authorized access" for the term "or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend." S.Rep. No. 99-342, at 9. The stated intent of the amendment was to "eliminate coverage for authorized access that aims at 'purposes to which such authorization does not extend,' " and to thereby "remove[ ] from the sweep of the statute one of the murkier grounds of liability, under which a [person's] access to computerized data might be legitimate in some circumstances, but criminal in other (not clearly distinguishable) circumstances that might be held to exceed his authorization.' " S.Rep. No. 99-432, at 21.

Furthermore, the Court agrees with the _Lockheed_ line of cases that principles of statutory construction require the adoption of a narrow view of the CFAA. When a court is confronted with two rational readings of a criminal statute, it is required to construe the statute in favor of the defendant. _See United States v. Santos,_ --- U.S. ----, 128 S.Ct. 2020, 2025, 170 L.Ed.2d 912 (2008). This rule of lenity applies to civil statutes that have criminal applications because courts are required to interpret such statutes consistently, regardless of whether the court encounters the statute in a criminal or noncriminal context. _Clark v. Martinez,_ 543 U.S. 371, 380, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). The CFAA has both civil and criminal applications and given the two proposed readings of the statute- (1) the broad interpretation of "without authorization" and "exceeds authorization" articulated in the _Shurgard/Citrin_ line of cases and (2) the narrower interpretation advanced by the _Lockheed_ line of cases-the rule of lenity requires the Court to favor the narrower interpretation.

**\*6** Finally, but of equal importance, the interpretation adopted by the _Shurgard/Citrin_ line of cases would create a federal cause of action for an employer whenever an employee accesses information

on the company computer with intentions of using that information in a manner adverse to the employer's interests or in violation of a duty of loyalty. *See Citrin*, 440 F.3d at 420-21. "The Court declines the invitation to open the doorway to federal court so expansively when this reach is not apparent from the plain language of the CFAA." *Shamrock Foods*, 535 F.Supp.2d at 967; *see also Cleveland v. United States*, 531 U.S. 12, 24-25, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (rejecting a "sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress").

There is no dispute that Haugum, as Vice President of Global Sales, was permitted to access Condux's computers. Therefore, he was not "without authorization" when he accessed the computers. Additionally, because he was permitted to access the specific confidential business information, he did not "exceed authorized access." In *Werner-Masuda*, the court noted that "the gravamen of [the] complaint is not so much that [the defendant] accessed the information ..., but rather what she did with the information once she obtained it. The ... CFAA, however, do[es] not prohibit the unauthorized disclosure or use of information, but rather unauthorized access." 390 F.Supp.2d at 499. Similarly, the court in *Black & Decker* explained:

> Clearly, the Plaintiff objects not to [the] accessing of the information, but to [the] later misuse thereof. Thus, while the Complaint includes claims that the Defendant breached both the Employee Access Agreement and the confidentiality agreements by allegedly disclosing ... trade secrets and proprietary information, ... no facts alleged indicate that Smith exceeded the access he was granted by the Plaintiff or that he accessed the data without authorization.

568 F.Supp.2d at 936. Here too, the conduct at the heart of the dispute is not the access of the confidential business information but rather the alleged subsequent misuse or misappropriation of that information. Such allegations, however, are not sufficient to state a claim for violations of subsections (a)(2), (a)(4), or (a)(5)(ii) or (iii).

## 2. Alleged Violations of subsections (a)(5)(A)(i)

A violation of subsection (a)(5)(A) also occurs when a person knowingly causes the transmission of a program, information, code, or command, and as a result, intentionally causes damage without authorization to a protected computer. 18 U.S.C. § 1030(a)(5)(A)(i). Unlike subsections (a)(2), (a)(4), and (a)(5)(ii) and (iii), which are all predicated on unauthorized *access*, a violation of subsection (a)(5)(A)(i) is predicated on unauthorized *damage*. Haugum argues that Condux has not and cannot allege such damage, as that term is defined by the CFAA, and, therefore, Condux cannot state a claim based on a violation of subsection (a)(5)(A)(i).

**\*7** The CFAA defines the term "damage" as meaning "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Haugum contends that there have been no allegations of such impairment to the integrity or availability of data, a program, a system, or information. Further, he claims, "it appears that [Condux] always was able to access the information alleged to have been misappropriated by [Haugum]." Def.'s Mem. in Supp. of Mot. to Dismiss [Docket No. 9] at 7-8. In response, Condux relies on cases holding that allegations of an employee's downloading or copying of confidential business information from an employer's secure computer system is sufficient to allege impairment to the integrity of data or information. *See, e.g., Shurgard*, 119 F.Supp.2d at 1126-27 (concluding that allegations of infiltrating a computer network and gathering and disseminating confidential information impaired the integrity of data even though no data was physically changed or erased); *Pac. Aerospace*, 295 F.Supp.2d at 1195-97 (concluding that "caselaw supports an employer's use of the CFAA's civil remedies to sue [its] former employees ... who seek a competitive edge through wrongful use of information [obtained] from the former employer's computer systems").

Not surprisingly considering the previously discussed conflicts regarding the interpretation and application of the CFAA, there is disagreement among courts on whether the mere unauthorized copying, downloading, or emailing of confidential or proprietary information is sufficient to allege impairment of the integrity of data, a system, or information. In *Garelli Wong & Assocs., Inc. v. Nichols*, the court, disagreeing with *Shurgard* and *Pac. Aerospace*, held that the misappropriation of trade secrets through the use of a computer, by itself, is insufficient to allege impairment to the

integrity or availability of data, a system, or information. 551 F.Supp.2d 704, 709-710 (N.D.Ill.2008); *see also* *Sam's Wines & Liquors, Inc. v. Hartig*, No. 08 C 570, 2008 WL 4394962, at *3 (N.D.Ill. Sept.24, 2008) (finding the reasoning in *Garelli Wong* persuasive and declining to follow *Shurgard* ); *Lockheed Martin*, 2006 WL 2683058, at *3, 8 (concluding that "[t]he copying of information from a computer onto a CD or PDA is a relatively common function that typically does not, by itself, cause permanent deletion of the original computer files," and thus, does not, by itself, constitute "damage" under the CFAA). In reaching this conclusion, the *Garelli Wong* court relied heavily on an unpublished case discussing the meaning of the term "integrity." *See* 551 F.Supp.2d at 709 (citing *Resdev, LLC v. Lot Builders Ass'n, Inc.*, No. 6:04-CV-1374, 2005 WL 1924743 (M.D.Fla. Aug.10, 2005). In *Resdev*, the court explained:

Another thing that detracts from *Shurgard* is its heavy reliance on legislative history. For instance, based on legislative history, *Shurgard* adopted an unusual and extraordinary interpretation of the word "integrity" within the CFAA's definition of "damage".... It found "integrity" to contemplate the loss of a trade secret's exclusivity value. "Integrity," however, ordinarily means "wholeness" or "soundness," Oxford English Reference Dictionary 731 (Rev.2d ed.2002), and contemplates, in this context, some diminution in the completeness or useability of data or information on a computer system. This Court finds no meaningful ambiguity that might weigh in favor of relying on legislative history....

**\*8** 2005 WL 1924743, at *5 n. 3 (quotations omitted); *see also* *Worldspan, L.P. v. Orbitz, LLC*, No. 05 C 5386, 2006 WL 1069128, at *5 (N.D.Ill. Apr.19, 2006) (agreeing with *Resdev* regarding the ordinary meaning of "damage" and "integrity" and rejecting the argument that "the mere 'taking of information' constitutes 'damage' under the CFAA").

The Court finds the reasoning in *Garelli Wong* and *Resdev* persuasive. The "damage" contemplated by subsection (a)(5)(A)(i) requires some "diminution in the completeness or useability of data or information on a computer system." *Resdev*, 2005 WL 1924743, at *5 n. 3. Here, there have been no allegations that Haugum diminished the "completeness or useability" of the computer data or information he obtained. Haugum's alleged activities may well have compromised or diminished the confidentiality, exclusivity, or secrecy of the proprietary information that had been expressed in the form of computer data. But the plain language of the statute requires some alteration of or diminution to the integrity, stability, or accessibility of the computer data itself. In other words, the complained of activity must have an effect on the binary coding used to create, store, and access computerized representations of information.

Condux also claims that it has sufficiently pleaded damage by its allegation that "[b]y deleting or attempting to delete evidence that he misappropriated Condux's Confidential Business Information, Haugum impaired both the integrity and availability of that data and information." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 15. An allegation that Haugum did in fact delete computer data would perhaps be sufficient under the above interpretation of "damage." However, a review of Condux's Amended Complaint reveals no allegation of actual deletion. Condux repeatedly alleges that Haugum *attempted* to delete evidence of his computer activities, but at no time does Condux allege that Haugum accomplished a deletion of anything. *See* Am. Compl. ¶¶ 14, 26, 29, 30, 31, 32. In its brief submitted in opposition to Haugum's motion, Condux explains: "It appears that Haugum deleted evidence of his wrongful conduct, but evidence of the deletion and what Haugum was attempting to delete remained on the computer system." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 15 n. 7. To the extent that this could be viewed as an allegation that Haugum succeeding in deleting data (rather than merely attempting to do so), there is no similar allegation in the Amended Complaint, which refers only to attempted deletions. Accordingly, the allegation in the briefing may not be considered in deciding a Rule 12 motion to dismiss.[FN5] *See* *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir.2004).

FN5. Even if the allegation had been properly raised, it is unclear whether it would be sufficient to show "damage." *See* *Lockheed Martin*, 2006 WL 2683058, at *8 (suggesting that an allegation of " *permanent* deletion or removal" is necessary to satisfy the CFAA's definition of "damage") (emphasis added).

In sum, Condux is unable to allege that Haugum was "without authorization" or that he "exceeded authorized access," and, thus, the claim for violations of §§ 1030(a)(2), (a)(4), and (a)(5)(ii) and (iii) fail. And because there is no allegation of the "damage" contemplated by the CFAA, the claim for a violation of § 1030(a)(5)(A)(i) likewise fails. Condux's allegations that Haugum acted wrongfully in accessing the confidential business information to later use for his own benefit may very well support other claims; indeed, they are the basis for the state law claims of misappropriation of trade secrets, misappropriation of confidential business information, breach of fiduciary duties, and unfair competition. But they are not allegations that will support a CFAA claim.

**C. State Law Claims**

   *9 The sole jurisdictional basis asserted for Counts Two through Five is 28 U.S.C. § 1367(a), which permits a district court to exercise supplemental jurisdiction over claims that are part of the same case or controversy as claims that fall within its original jurisdiction. *See* Am. Compl. ¶ 3; Pl.'s Mem. in Opp'n to Mot. to Dismiss at 18-19. When a district court has dismissed all claims over which it has original jurisdiction, the court may in its discretion decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c)(3); *Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir.2006). Having dismissed Count One (the CFAA claim), the sole count within the Court's original jurisdiction, the Court declines to exercise supplemental jurisdiction over Condux's state law claims and dismisses those claims without prejudice.

### IV. CONCLUSION

   Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

   1. Defendant John Haugum's Motion to Dismiss [Docket No. 5] is **GRANTED;**

   2. Count One of Plaintiff Condux International, Inc.'s Amended Complaint [Docket No. 7] is **DISMISSED WITH PREJUDICE;** and

   3. Counts Two, Three, Four, and Five of the Amended Complaint [Docket No. 7] are **DISMISSED WITHOUT PREJUDICE.**

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**

D.Minn.,2008.
Condux Intern., Inc. v. Haugum
Not Reported in F.Supp.2d, 2008 WL 5244818 (D.Minn.)

Motions, Pleadings and Filings (Back to top)

• 0:08cv04824 (Docket) (Aug. 1, 2008)
END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

▷

**Mclean v. Mortgage One & Finance Corp.**
Not Reported in F.Supp.2d, 2004 WL 898440
D.Minn.,2004.
April 09, 2004 (Approx. 2 pages)

Not Reported in F.Supp.2d, 2004 WL 898440 (D.Minn.)

Motions, Pleadings and Filings
Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Blake MCLEAN, Jesse Spaeth, Kris Kurth, Trevor Anker, Ben Lambert, Lee Barron, Keophosy
Fongsumonth, Nathan Reardon, and Eric Flamm, on behalf of themselves and other past and present
similarly situated, Plaintiffs,
v.
MORTGAGE ONE & FINANCE CORPORATION, and David Delavari, Defendants.

No. Civ.04-1158(PAM/JSM).
April 9, 2004.

Adam A. Gillette, James H. Kaster, Nichols Kaster & Anderson, Craig William Trepanier, James C.
MacGillis, Trepanier & MacGillis PA, Mpls, MN, for Plaintiffs.

Gavin Paulson Craig, Craig Law Office, Wayzata, MN, for Defendanst.

MEMORANDUM AND ORDER
MAGNUSON, J.

   *1 This matter is before the Court on Defendants' Motion for a Temporary Restraining Order.
Because Plaintiffs have responded to the Motion, the Court will convert the Motion into a Motion for
Preliminary Injunction.

BACKGROUND
   Plaintiffs are former employees of Defendant Mortgage One & Finance Corporation ("Mortgage
One"). Mortgage One is a mortgage broker. Plaintiffs brought a Complaint against Mortgage One and
its President, Defendant David Delavari, alleging that Defendants required them to work in excess of
40 hours per week without compensation in violation of the Fair Labor Standards Act. The Complaint
purports to be on behalf of Plaintiffs and all others similarly situated. Mortgage One contends that
Plaintiffs Kris Kurth, Nathan Reardon, Eric Flamm, and Ben Lambert stole secret customer
information, in violation of Minnesota law and the confidentiality and non-solicitation agreements they
signed with Mortgage One.FN1 Mortgage One also asserts that these Plaintiffs wrongfully entered a
secure website maintained by a lender and downloaded customer information from that site,
ostensibly in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Finally, Mortgage One
alleges that Plaintiffs are wrongfully attempting to lure employees away from Mortgage One, in
violation of Minnesota law and their non-solicitation agreements. Mortgage One seeks an injunction
against all of these alleged wrongs.

       FN1. Mortgage One makes no allegations with respect to the remaining five Plaintiffs.
       However, the Motion does not otherwise distinguish between Plaintiffs and seeks an
       injunction against all Plaintiffs.

DISCUSSION
   A preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood
of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest
favors the movant; and (4) that the movant will suffer irreparable harm absent the injunction.
Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir.1981). Injunctive relief is
considered to be a "drastic and extraordinary remedy that is not to be routinely granted." Intel Corp.
v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed.Cir.1993).

## A. Likelihood of Success on the Merits
### 1. *Breach of Confidentiality and Non-Solicitation Agreement*

   Although Mortgage One contends that this Motion is not based on the alleged breach of Plaintiffs' confidentiality and non-solicitation agreements, much of the discussion relating to whether Plaintiffs knew or should have known that Mortgage One's customer lists were confidential centers on the existence of these agreements. Thus, the Court must preliminarily determine whether these agreements are enforceable.

   Mortgage One contends that the agreements were entered into at the inception of employment and are therefore supported by consideration and are valid. Plaintiffs, on the other hand, argue that they signed the agreements after beginning employment and that the agreements are therefore not valid. It is well settled in Minnesota that a restrictive covenant that is not part of the initial employment contract must be supported by independent consideration. *Freeman v. Duluth Clinic, Inc., 334 N.W.2d 626, 630 (Minn.1983)*. There is no evidence that the agreements at issue were supported by anything other than the promise of continued employment. Absent other consideration, the promise of continued employment does not constitute sufficient consideration for a restrictive covenant. See *Davies & Davies Agency v. Davies, 298 N.W.2d 127, 130-31 (Minn.1980)*. Because there is a genuine dispute as to whether the agreements were signed before Plaintiffs began their employment, and because restrictive covenants are looked on with disfavor and carefully scrutinized, *Nat'l Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn.1982)*, Mortgage One has not established a likelihood of success on any of its claims seeking to enforce the covenants in the confidentiality and non-solicitation agreements.

### 2. *Computer Fraud & Abuse Act*

   **\*2** Mortgage One contends that its claims under the Act arise under 18 U.S.C. § 1030(a)(4). (Defs.' Supp. Mem. at 10.) This section prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization ... [and thereby] obtain[ing] anything of value [of more than $5000]...." 18 U.S.C. § 1030(a)(4). The Act provides that one who suffers "damage or loss" because of a violation of the Act may bring a civil action for compensatory damages and injunctive relief. *Id.* § 1030(g). However, the Act limits civil enforcement to actions claiming a violation of § 1030(a)(5)(B), not § 1030(a)(4). Thus, Mortgage One cannot maintain a civil action on its claims for a violation of § 1030(a)(4), and is therefore not likely to succeed on its claims under the Act.

### 3. *Misappropriate of Confidential Information and Trade Secrets*

   The crux of Mortgage One's claims of misappropriation is that Plaintiffs' stole Mortgage One's confidential customer lists. However, Mortgage One does not independently discuss this claim in its memorandum. Rather, Mortgage One quotes extensively from Plaintiffs' confidentiality agreements, and seems to rely on the alleged violation of the confidentiality agreements as proof that Plaintiffs misappropriated Mortgage One's confidential and trade-secret information. Thus, Mortgage One does not discuss the requirements for trade secrets, such as whether the information was not generally known or readily available, or whether Mortgage One made reasonable efforts to maintain the secrecy of the information. Minn.Stat. § 325C.01, subd. 5.

   Absent any evidence that the information at issue indeed constitutes trade secrets or confidential information, Mortgage One cannot show that it is likely to succeed on the merits of its misappropriation claims. Moreover, the Court has determined that there is a substantial question as to whether the confidentiality agreements are enforceable. Thus, Mortgage One may not rely on the existence of confidentiality agreements to establish that the information protected by those agreements is a trade secret. Mortgage One has failed to show that it is likely to succeed on the merits of its misappropriation claims.

### 4. *Other Claims*

   Mortgage One also argues that it is likely to succeed on the merits of its claims regarding Plaintiffs' alleged interference with Mortgage One's employees. However, Mortgage One clearly states in its memorandum that its request for injunctive relief is based solely on the irreparable harm caused by Plaintiffs' alleged misappropriation of confidential customer information. (Defs.' Supp. Mem. at 8.) Thus, the Court will not analyze the merits of Mortgage One's other claims.

## B. Irreparable Harm

Mortgage One contends that Plaintiffs' activities in "obtaining [Mortgage One's] confident customer information and contacting prospective, current and former customers" are irreparably harming Mortgage One. (Defs.' Supp. Mem. at 8.) According to Mortgage One, the loss of a customer means not only that Mortgage One loses that customer's present business, but also the possibility of future business and referrals from that customer. Plaintiffs contend that any harm Mortgage One suffers can be easily quantified, and thus that there is no irreparable harm.

**\*3** The misappropriation of trade secrets can constitute irreparable harm if the victim can show a threat that those secrets will be used and will cause the victim injury. However, because Mortgage One has failed to show that it is likely to succeed on the merits of its misappropriation claims, it has likewise failed to show that it will suffer any irreparable harm. *Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.,* 941 F.Supp. 98, 101 (D.Minn.1992) (Magnuson, J.) (noting that for injunction to issue, movant must show both misappropriation of trade secrets and threat of disclosure of those secrets). The absence of irreparable harm alone justifies the denial of the Motion, and the Court need not consider the remaining *Dataphase* factors. *See, e.g., Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir.1989) (en banc) (injunction may not issue without a showing of irreparable harm); *Dataphase,* 640 F.2d at 114 n. 9 ("absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction").

## CONCLUSION

The Court finds that Mortgage One is not entitled to an injunction. Accordingly, IT IS HEREBY ORDERED that Defendants' Motion for injunctive relief (Clerk Doc. No. 5) is DENIED.

D.Minn.,2004.
Mclean v. Mortgage One & Finance Corp.
Not Reported in F.Supp.2d, 2004 WL 898440 (D.Minn.)

Motions, Pleadings and Filings (Back to top)

• 2006 WL 1207419 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (Mar. 6, 2006) ⇉ Original Image of this Document (PDF)
• 2005 WL 3024596 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Third-Party Defendant's Motion for A Protective Order Pursuant to Fed.Rule Civ. Pro. 26(c) or in the Alternative, A Motion to Quash Subpoenas Pursuant to Fed. Rule Civ. Pro. 45(c) (3) (a) (Sep. 22, 2005) ⇉ Original Image of this Document (PDF)
• 2004 WL 3023850 (Trial Pleading) Reply to Second Amended Counterclaim (Jun. 14, 2004) ⇉ Original Image of this Document (PDF)
• 2004 WL 3023862 (Trial Pleading) Defendants Second Amended Answer and Counterclaim (May 4, 2004) ⇉ Original Image of this Document (PDF)
• 0:04cv01158 (Docket) (Mar. 10, 2004)
END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**In re Potash Antitrust Litigation**
Not Reported in F.Supp., 1993 WL 543013
D.Minn.,1993.
December 08, 1993 (Approx. 18 pages)

Not Reported in F.Supp., 1993 WL 543013 (D.Minn.), 1994-1 Trade Cases P 70,644

Motions, Pleadings and Filings
United States District Court, D. Minnesota, Third Division.
In Re Potash Antitrust Litigation.

Civ. No. 3-93-197, No. MDL 981.
Dec. 8, 1993.

Samuel Heins and W. Joseph Bruckner, Heins, Schatz & Paquin, Jerry S. Cohen and Michael Hausfeld, Cohen, Milstein, Hausfeld & Toll, H. Laddie Montague and Howard Langer, Berger & Montague, Dan Harris, Sachnoff & Weaver, Jack Chestnut, Chestnut & Brooks, John Cochrane, Cochrane & Bresnahan, Michael Freed, Much, Shelist, Freed, Denenberg & Ament, Wood Foster, Siegel, Brill, Gruepner & Duffy, Sara Madsen, Reinhardt and Anderson, for plaintiffs.

APPEARING FOR DEFENDANTS

*1 Michael Jaffe, James Mercurio, Gerald Zingone, and Jerome Pederson, for Potash Corp. of Saskatchewan and Potash Corp. of Saskatchewan Sales, Ltd.
Stephen Marshall, for New Mexico Potash Corp. and Eddy Potash, Inc.

Victor Friedman, Leon Goodrich, and Bradley Clary, for Potash Corp. of America.

David Gustman, Leon Goodrich, and Bradley Clary, for Noranda Minerals, Inc. and Central Canada Potash Co.

Doug Rosenthal, Leon Goodrich, and Bradley Clary, for Kalium Chemicals, Ltd. and Kalium Canada, Ltd.

Marc Gary, Kerry Edwards, Gordon Busdicker and John French, for IMC Fertilizer Group, Inc.

Wayne Cross and Carol Peterson, for Mississippi Chemical Corp.

Gerald Connell, for Cominco, Ltd. and Cominco American Inc.

MEMORANDUM OPINION AND ORDER
KYLE, District Judge.

Introduction
     Plaintiffs, fertilizer producers located in the United States, commenced, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 (1988), this action against Defendants,[FN1] all of which are producers of potash,[FN2] seeking injunctive relief, damages, and attorneys' fees, for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Before the Court are (1) Defendants' Joint Motion to Disqualify Plaintiffs' Counsel and Dismiss Their Complaints,[FN3] (2) Certain Defendants' Joint Motion, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), to Dismiss, and (3) Defendant Kalium Chemicals, Ltd. and Kalium Canada, Ltd.'s (collectively "Kalium") Motion, pursuant to Fed.R.Civ.P. 12(b)(6), to Dismiss.[FN4]

Background
Parties, Procedural History, and Claims Alleged
     Plaintiffs in Potash are Blomkest Fertilizer, Inc., a Minnesota corporation with its principal place of business in Blomkest, Minnesota; Cobden Grain & Feed, a sole proprietorship with its principal place of business in Sleepy Eye, Minnesota; Hahnaman Albrecht, Inc., an Illinois corporation with its principal place of business in Dixon, Illinois; Laing-Gro Fertilizers, Inc., a New York corporation with its principal place of business in Eden, New York; John Peterson, d/b/a/ Almelund Feed & Grain, a sole

proprietorship with its principal place of business in Almelund, Minnesota; and Clearbrook Ag Service, Inc., a Minnesota corporation with its principal place of business in Clearbrook, Minnesota.

Plaintiffs in *Tolley's* are Tolley's, Inc., a Virginia corporation with its principal place of business in Pamplin, Virginia, and James River Farm Service, Inc., a Virginia corporation with its principal place of business in Cartersville, Virginia.

Plaintiff in *Reamford* is Reamford Liquid Fertilizer, Inc., a Virginia corporation with its principal place of business in Amelia, Virginia.

Each of the Plaintiffs in *Potash, Reamford,* and *Tolley's* has purchased potash directly from one or more of the Defendants during the time period relevant to this action.

The Defendants in *Potash, Reamford,* and *Tolley's* are (1) Potash Corporation *of* Saskatchewan, Incorporated, ("PCS, Inc."), a Saskatchewan corporation with its principal place of business in Saskatoon, Saskatchewan, Canada; [FN5] (2) Potash Corporation of Saskatchewan Sales Limited ("PCS Sales"), a Saskatchewan corporation with its principal place of business in Arlington Heights, Illinois; [FN6] (3) Potash Company of America, Inc. ("PC America"), a Canadian corporation with its principal place of business in Darien, Connecticut; (4) IMC Fertilizer Group, Inc. ("IMC"), a Delaware corporation with its principal place of business in Northbrook, Illinois; (5) Kalium Chemicals, Ltd., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois; (6) Kalium Canada, Ltd., a Saskatchewan corporation with its principal place of business in Regina, Saskatchewan, Canada; (7) Noranda Minerals Inc. ("Noranda"), an Ontario corporation with its principal place in Toronto, Canada; (8) Central Canada Potash Co. ("Central"), a Saskatchewan corporation with its principal place of business in Colonsay, Saskatchewan, Canada; (9) Noranda Sales Corporation, Ltd. ("Noranda Sales"), an Ontario corporation with its principal place of business in Toronto, Canada; (10) Cominco, Ltd. ("Cominco"), a British Columbia corporation with its principal place of business in Vancouver, British Columbia, Canada; (11) Cominco American Incorporated ("Comincan"), a Washington corporation with its principal place of business at in Spokane, Washington; [FN7] (12) Mississippi Chemical Corp. ("Mississippi"), a Mississippi corporation with its principal place of business in Yazoo City, Mississippi; (13) Eddy Potash, Inc. ("Eddy"), a Delaware corporation with its principal place of business in Carlsbad, New Mexico; and (14) New Mexico Potash Corporation ("New Mexico"), a New Mexico corporation with its principal place in Hobbs, New Mexico.[FN8]

**\*2** On April 1, 1993 the first of twelve complaints was filed in this Court, alleging that Defendants violated Section 1 of the Sherman Act by engaging in a conspiracy to fix the sale price of potash. On May 19, 1993 this Court issued Pretrial Order No. 1, directing the parties to file an Amended Consolidated Class Action Complaint (" *Potash Complaint* ") consolidating the separate actions filed in this Court; the *Potash Complaint* was filed on June 3, 1993.

Plaintiffs in *Potash, Tolley's,* and *Reamford* are alleging a class action on behalf of themselves and, pursuant to Fed.R.Civ.P. 23, the following class:

All purchasers of potash in the United States (excluding federal, state and local governmental entities and political subdivisions and defendants and coconspirators, and other producers of potash, their respective parents, subsidiaries and affiliates) that purchased potash from any defendant, or their parent, subsidiary or affiliate thereof, at any time during the period from April 1987 to the present.

*Potash Complaint,* ¶ 33; *see Reamford,* ¶ 26; *see Tolley's,* ¶ 27. For purposes of the motions before the Court, the following facts, taken from the *Potash Complaint* (with citations to similar allegations in *Tolley's* and *Reamford* ), are *assumed* to be true.

Beginning at least as early as April 1987, and continuing to the present, defendants and co-conspirators engaged in a continuing combination and conspiracy to, *inter alia,* fix the price of potash, and thereby effect an unreasonable restraint of interstate and foreign trade and commerce in violation

of <u>Section 1</u> of the Sherman Act, <u>15 U.S.C. § 1</u>. *Potash Complaint,* ¶¶ 42-43; *Tolley's,* ¶¶ 36-37; *Reamford,* ¶¶ 35-36.

In order to effect their price-fixing conspiracy, Defendants engaged in the following acts. Beginning in April 1987, PCS, Inc., IMC, Cominco, Noranda and PC America discussed and agreed to raise prices of potash sold in the United States. Pursuant to their agreement, those same defendants raised their list prices and eliminated most discounting on potash sold in the United States. These actions caused potash prices to jump approximately $10 per ton, from roughly $40 per ton to roughly $50 per ton. *Potash Complaint,* ¶ 45; *Tolley's,* ¶ 39; *Reamford,* ¶ 38. Thereafter, in the fall of 1987, the Canadian Defendants,[FN9] through Crown PCS, requested the American Defendants [FN10] to join the conspiracy. The Canadian Defendants' proposal called for all Defendants to establish a minimum "floor" price of $75 per ton on potash sales in the United States. The American Defendants accepted the proposal and joined the conspiracy. *Potash Complaint,* ¶ 46; *Tolley's,* ¶ 40; *Reamford,* ¶ 39.

In mid-January 1988, in furtherance of the enlarged conspiracy, Crown PCS announced a new list price of $80 per ton. This new price (which reflected the elimination of a temporary, refundable $35 per ton surcharge which had been imposed in September 1987) effectively raised Crown PCS' prices about $19 per ton. Soon thereafter, the other Canadian Defendants matched Crown PCS' prices, while the American Defendants posted new list prices ranging from about $85 per ton to $92 per ton. *Potash Complaint,* ¶ 47; *Tolley's,* ¶ 41; *Reamford,* ¶ 40.

**\*3** In or about June 1988, Defendants again agreed to raise their list prices for potash. In an effort to conceal the collusive nature of the price increase, the defendants further agreed to stagger their respective price increase announcements. In early June 1988, and pursuant to this latest agreement, Crown PCS announced a new list price of $84 per ton, effective July 1, 1988 through December 31, 1988. Soon thereafter, but at different times, the other Defendants, in accordance with the conspiracy, announced comparable list price increases. *Potash Complaint,* ¶¶ 48-49; *Tolley's,* ¶ 42-43; *Reamford,* ¶¶ 41-42.

Plaintiffs further allege that from 1989 to the present, Defendants have continued to discuss and agree upon, i.e., conspire to fix, prices and levels of supply of potash sold in the United States. As a result of Defendants' ongoing conspiracy, potash prices have remained at artificially high levels despite excess supply. *Potash Complaint,* ¶ 50; *Tolley's,* ¶ 44; *Reamford,* ¶ 43.

Plaintiffs also allege that throughout the period of their allegedly unlawful conduct, Defendants have attempted to hide their conspiracy and its effects by engaging in acts of fraudulent concealment, including (1) "secretly and conspiratorially" discussing and agreeing upon the prices to be charged to customers, (2) using means of communication which they believed to be safe from detection and avoiding means of communication which they believed to be subject to detection, and (3) agreeing to stagger and staggering their price increases and announcement thereof in order to conceal their unlawful price agreements. *Potash Complaint,* ¶ 52; *Tolley's,* ¶ 45; *Reamford,* ¶ 44. Plaintiffs allege that neither they nor any potential members of the class had "knowledge of such unlawful conduct or of facts which might have led to the discovery thereof with the exercise of due diligence until some time shortly before filing this Complaint"; hence, Defendants' affirmative acts of concealment have tolled the running of any statute of limitation. *Potash Complaint,* ¶ 53; *Tolley's,* ¶ 45; *Reamford,* ¶ 44.

Plaintiffs allege that the Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, <u>15 U.S.C. §§ 15</u> (authorizing civil actions for monetary damages to redress violations of Sherman Act) and 26 (authorizing civil actions for injunctive relief), and <u>28 U.S.C. § 1336</u>. Venue as to each defendant is proper in this judicial district pursuant to <u>15 U.S.C. § 22</u> and <u>28 U.S.C. §§ 1391 (b)</u> and <u>(c)</u>. Defendants do not contest either jurisdiction or venue.

*Facts Relevant to Keith Barton's Involvement in Litigation*
Keith Barton is a Canadian lawyer; he was admitted to the bar of Saskatchewan in July of 1965 and practiced with a law firm in Saskatchewan. On August 1, 1978, he joined Crown PCS, a corporation owned by the Province of Saskatchewan. In 1979, Barton was appointed Vice President and General Counsel for Crown PCS, i.e., he was the senior lawyer working for Crown PCS. As General Counsel, Barton was "principle legal counsel to the corporation and as such, [was] involved in all

significant transactions, negotiations, documentation, and agreements undertaken by [Crown] PCS its subsidiaries ... [and] responsible for all corporate matters and securities work, including major acquisitions, dispositions, and taxation." Position Description, Vice President and Legal Counsel, Hampton Aff., Exh. B. In addition, Barton was a member of Crown PCS' Executive Committee and of the Boards of Crown PCS' subsidiaries, he participated in the "development of Corporate policies, philosophies, and objectives", *id.,* and he served as corporate Secretary for Crown PCS. Finally, as General Counsel, Barton's role included

**\*4** 1. Provid[ing] legal counsel and guidance to the Corporation to ensure maximum protection of legal rights. [and]

2. Supervis[ing] all legal matters and represent[ing] the Corporation in all suits or claims.

*Id.* at 3 (identifying "Specific Accountabilities"). Barton was appointed to Crown PCS's Board of Directors in February, 1983.

Barton denies that he ever worked for PCS Sales or any of the other subsidiary corporations. Barton Aff., ¶ 7.

In April of 1987, C.E. Childers became Crown PCS' President. Following Childers' arrival, Childers and Barton were actively involved in resolving a "dumping" investigation that had been commenced by the United States Department of Commerce; the investigation sought to discover whether Canadian potash producers had been charging their United States customers less than cost for potash sold. A Suspension Agreement relating to the dumping investigation was signed on January 7, 1988; it was signed by all Canadian potash producers.

Barton resigned his employment on March 28, 1988; he left Crown PCS at the end of July, 1988. Barton stated that he left Crown PCS because "I was unhappy and concerned about the course of conduct" undertaken by Childers on behalf of Crown PCS. Barton Aff., ¶ 20. Following his resignation, Barton became involved in a dispute with Crown PCS over his right to severance pay; eventually, he filed a lawsuit in the Court of Queen's Bench of Saskatchewan, claiming damages for constructive dismissal or wrongful dismissal. *Id.* ¶ 21. Barton and Crown PCS settled the lawsuit via Minutes of Settlement entered into on August 4, 1989; the terms of the settlement are confidential. *Id.*

Following the Saskatchewan legislature's enactment of the "Potash Corporation of Saskatchewan Reorganization Act of September 12, 1989" (the "Potash Act"), all of the assets and liabilities of Crown PCS and one of its subsidiaries, Potash Corporation of Saskatchewan Mining, Limited ("PCS Mining"), were transferred to PCS, Inc. In exchange for their assets, Crown PCS and PCS Mining received 100% of the shares of PCS, Inc. Bruckner Aff., Exh. C. Crown PCS continued in existence, eventually changing its name to CIC. Pursuant to the Sales Agreement between Crown PCS and PCS, Inc., the management personnel of Crown PCS were retained by PCS, Inc.

1. Post-Separation Contacts with CIC and its Counsel
Following his separation from Crown PCS, Barton undertook to bring to light certain acts and statements made by and to Childers between April of 1987, when Childers arrived at Crown PCS, and July of 1988, when Barton left Crown PCS; Barton believed that those acts and statements reflected antitrust violations by the Canadian potash industry. In June of 1990, Barton contacted one of Crown PCS' Directors, Bud Estey, Barton Dep., at 27. Barton met with Estey in Regina, Saskatchewan; they discussed Barton's knowledge about anti-competitive activity at Crown PCS and Childers' role in that activity. *Id.* at 28-29. On June 25, 1990 Barton sent Estey a letter, in which he detailed certain events as well as statements made by Childers, all of which purportedly addressed the formation of a conspiracy to set and control the price of potash sold in North America. *See* Bruckner Aff., Exh. D.

**\*5** Barton also contacted CIC [FN11] and its Canadian counsel, Borden & Ellis, and brought the same information to them. Eventually, Borden and Ellis [FN12] prepared, with Barton's assistance, a "Memorandum of Evidence" dated March 11, 1992 (the "Memorandum"); the Memorandum contains a brief discussion of the Canadian potash industry, but seven of the ten pages discuss the

conversations, acts, and events which Barton witnessed or participated in when he was General Counsel at Crown PCS-all of which purportedly concern agreements and discussions by Canadian and American potash producers to set and control the price of potash. After the Memorandum was prepared, Barton sent a copy of it, as well as a binder of other information, to Ching. Barton Aff., ¶ 22.

On November 4, 1992, Newbould, on behalf of CIC, sent Barton the following letter:

This letter will confirm that CIC Mineral Interest Corporation (formerly known as Potash Corporation of Saskatchewan) has no objection to you speaking to the Competition Bureau of Canada or its representatives or to the Department of Justice in the United States with regard to the matter referred to in the memorandum of evidence dated March 11, 1992 prepared by us with you and to the contents of your binder of material given to Mr. Ching of Crown Management Board of Saskatchewan. This is not to be taken as a waiver of any position that CIC Mineral Interest Corporation may wish to take in any legal proceedings against it that your evidence might be privileged in view of your previous position as a legal advisor to Potash Corporation of Saskatchewan. It is however, a release of you personally to disclose these matters to the investigating authorities mentioned.

This will also confirm that a copy of the memorandum of March 11, 1992 and a copy of the binder of Green Market Reports that you provided to us have already been provided by us to the Competition Bureau of Canada. We have not given to the Competition Bureau of Canada a copy of your binder that you gave to us and to Mr. Ching.

Barton Aff., Exh. C.

Following Barton's receipt of Newbould's letter, his Canadian counsel, Gary C.W. Semenchuck of Hleck, Kanuka & Thuringer ("Hleck Firm"), sent Newbould a letter requesting that CIC provide Barton with a general waiver of any privilege so that Barton could contact potential plaintiffs' counsel about an antitrust action against members of the potash industry. In a letter dated December 3, 1992, Newbould responded:

With respect to the more general release that Mr. Barton has requested, I reiterate my earlier comments ... CIC Mineral Interest Corporation is not prepared to waive any privilege that it may have in connection with Mr. Barton's desire to speak to and assist potential plaintiffs against members of the potash industry.

Newbould Aff., Exh. C.[FN13] On January 19, 1993 Semenchuck sent a letter to Newbould asserting that CIC could not assert a privilege against Barton because (1) no such privilege existed as to the pricing conspiracy, and (2) CIC waived any privilege when it unilaterally disclosed the Memorandum and other materials to Canadian officials. Bruckner Aff., Exh. F, at 2.

**\*6** On December 21, 1992 the Hleck Firm issued Barton an opinion letter ("Hleck Opinion") concerning whether

your ethical obligations as a member of the Law Society of Saskatchewan would prevent you from working in the future as a consultant for plaintiffs and law firms bringing damage actions against your former employer [Crown PCS] which is now called CIC Mineral Interest Corporation ... and other potash producers.

Barton Aff., Exh. F. The Hleck Opinion opined that (1) assuming that the actions Barton was "required to take" as General Counsel for Crown PCS during the conspiracy "would be sufficient to allow a court to find that you were a co-conspirator" in the conspiracy, "Canadian law and the Saskatchewan Code of Professional Conduct for lawyers strips away the solicitor-client privilege which might otherwise seal your knowledge of the conspiracy and removes the duty on your part to keep silent about the scheme," *id.* at 4; and (2) CIC, by disclosing Barton's "revelation" to "third parties"-Canadian and American government authorities-waived its right to enforce against Barton any alleged solicitor-client duty of confidentiality. *Id.* at 5.

2. Post-Separation Contacts With Private Law Firms

Concurrent with his efforts to provide information to CIC, Barton explored the possibility of assisting private United States law firms with litigation against certain members of the potash industry. In late June of 1992, Barton made contact with Fredric C. Tausend of the Preston, Thorgenson ("Preston Firm") law firm in Seattle, Washington. Barton Dep., at 22, 29; Barton Notes, Pederson Aff., Exh. No. 11, at 371–72. Over the next few months, Barton travelled to Seattle and sent correspondence to the Preston Firm detailing both his knowledge of the potash industry and information concerning an antitrust conspiracy. Eventually, Barton and the Preston Firm ceased their discussions. Barton Dep., at 30-31.

Thereafter, Barton was put in contact with attorney Joel Davidow of the Dickstein, Shapiro & Warren ("Dickstein Firm") law firm in Washington, D.C. Barton Dep., at 32; Barton Aff., ¶ 27. In September of 1992 Barton met with Davidow and another attorney at the Preston Firm's offices in Seattle; Barton provided Davidow with a report that he had prepared and some corroborating materials. Barton Dep., at 33. Davidow and the Dickstein Firm reviewed the materials and had various discussions with Barton between September of 1992 and February of 1993. Barton Dep., at 35. Barton also provided Davidow with additional materials relating to anti-competitive activity. *Id.* Throughout Barton's contact with Davidow, there was an ongoing concern by some members of the Dickstein Firm about whether it was appropriate for Barton to be involved in any litigation and whether he could be paid for such involvement. Barton Dep., at 37; Davidow Dep., at 192-95; however, the Dickstein Firm never provided Barton with any opinion on those issues.[FN14]

**\*7** Eventually, Davidow informed Barton that he would be contacted by Cohen, Milstein, Hausfeld & Toll ("Cohen Firm"), a law firm located in Washington, D.C. In February of 1993 Michael Hausfeld of the Cohen Firm contacted Barton; thereafter, Barton flew to Washington, D.C. to meet with Hausfeld and other firm members. Barton Aff., ¶ 27; Barton Dep., at 40. On March 1, 1993 Barton met with members of the Cohen Firm at the Hay-Adams Hotel in Washington, D.C. Barton Dep., at 41. During that meeting, Barton and the Cohen Firm executed an agreement ("Agreement") that Barton would serve as a "consultant" to the Cohen Firm in connection with an antitrust action against members of the potash industry. Cohen Aff., Exh. A. The terms of the Agreement provided that Barton would "not be expected to provide you with information with respect to the activities of my former employer, CIC Mineral Interests Corporation, except that which relates to price-fixing or other anti-competitive activity...." *Id.* In consideration for his services, Barton was to receive $180,000, payable in five installments,[FN15] air fare, and travel costs. *Id.*

The next day, Barton provided the Cohen Firm with two packages of materials, which the Cohen Firm photocopied.[FN16] Barton Dep., at 45. Thereafter, Barton engaged in the following acts in furtherance of the Agreement:

(1) engaged in telephone discussions, did research, and developed names of potential defendants;

(2) reviewed the first draft of the Complaint and made comments on it to the Cohen Firm over the telephone; [FN17]

(3) attended a meeting in Washington, D.C. on July 29, 1993, which was attended by several of Plaintiffs' counsel, including co-lead counsel, Heins, Schatz & Paquin ("Heins Firm"), Berger & Montague ("Berger Firm"), and the Cohen Firm; [FN18]

(4) identified persons who were involved in and/or had knowledge of the conspiracy; and

(5) handed over to the Cohen Firm a copy of the Memorandum.

Barton Dep., at 47-51; Barton Aff., ¶ 31. Barton's direct involvement with Plaintiffs' counsel ceased, at least temporarily, on July 26, 1993, when Barton was served with papers in connection with an action PCS, Inc. and PCS Sales had commenced against him; [FN19] PCS, Inc. and PCS Sales sought a preliminary injunction restraining Barton from disclosing any information to Plaintiffs' counsel. On

August 2, 1993 Barton consented to entry of an interlocutory injunction prohibiting disclosures of
certain confidential information.

3. Disclosure of Current Controversy
    On August 18, 1993 a status conference was held before the undersigned; in connection therewith,
counsel for Defendants first raised the issue of the impropriety of Barton's actions and disclosures. At
the status conference, Defendants advised the Court of their intention to seek disqualification of
Plaintiffs' counsel and dismissal of the Complaints, on the ground that the litigation resulted from
Barton's breach of his ethical duties to his former employer/client. These motions followed.

Discussion
Motion to Disqualify Counsel and Dismiss Complaints

I. What Law Governs the Analysis

    **8** Defendants contend that the ethical standards applicable to the instant motion are "federal
standards developed under federal law." (Mem.Supp.Mot. to Disq. and Dismiss., at 16 n. 14.)
Conversely, Plaintiffs take two positions: (1) Canadian law controls because "what is involved here is
a duty of confidence owed by a Canadian lawyer to a Canadian corporation," (Mem.Opp'n Mot. to
Disq. and Dismiss, at 14); and (2) pursuant to D.Minn.R. 83.6(d), the Minnesota Rules of Professional
Conduct govern this Court's analysis of Barton's conduct. *Id.* at 23.

    Whether Barton's conduct in this matter violated any rules of professional conduct will be
determined by examining the current version of the Code of Professional Conduct of the Law Society
of Saskatchewan ("Law Code"), and interpretations of that Code and similar Codes by Canadian
courts.[FN20] The professional conduct of attorneys licensed to practice in the federal district court is
governed, pursuant to D.Minn.R. 83.6(d), by the Minnesota Rules of Professional Conduct,[FN21] *see
Bieter Co. v. Blomquist,* 132 F.R.D. 220, 223 (D.Minn.1990); however, Barton is not licensed to
practice before this Court. Moreover, Defendants' entire argument is premised on their assertion that
Barton violated his ethical obligations and that those violations have come to taint this litigation. It
seems clear to the Court, therefore, that the relative propriety of Barton's conduct must be judged
under the principles of conduct to which he was bound. However, because this Court bears the
responsibility for the supervision of the members of its bar in litigation before it, *Coffelt v. Shell,* 577
F.2d 30, 32 (8th Cir.1978), the appropriate remedy in this case for any violations by Barton will be
determined under the factors applied by courts of this Circuit. *See United States v. Agosto,* 675 F.2d
965, 969 (8th Cir., *cert. denied,* 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982).

*A. The Law Code*
    The Law Code provides a series of "Rules," along with accompanying "Commentary" and "Notes."
Each Rule is to be interpreted in the light of the related Commentary and Notes. Law Code, at vii. The
Rules in Chapter IV ("Confidential Information") and Chapter V ("Impartiality and Conflict of Interest
Between Clients") are raised by Barton's acts and disclosures.

1. Law Code Chapter IV
    The Rule in *Chapter IV* provides:

    The lawyer has a duty to hold in strict confidence all information concerning the business and affairs
    of the client acquired in the course of the professional relationship, and shall not divulge such
    information unless the disclosure is expressly or impliedly authorized by the client, required by law
    or otherwise permitted or required by this Code.

Law Code, at 12. Commentary No. 4 to the Rule provides:

    The lawyer owes a duty of secrecy to every client without exception, regardless of whether it be a
    continuing or casual client. The duty survives the professional relationship and continues indefinitely
    after the lawyer has ceased to act for the client, whether or not differences have arisen between
    them.

**\*9** *Id.* Commentary No. 5 provides, in pertinent part:

The fiduciary relationship between lawyer and client forbids the lawyer to use any confidential information covered by the ethical rule for the benefit of the lawyer or a third person, or to the disadvantage of the client.

*Id.,* at 13.

Commentary No. 11 provides:

Disclosure of information necessary to prevent a crime will be justified if the lawyer has reasonable grounds for believing that a crime is likely to be committed and will be mandatory when the anticipated crime is one involving violence against the person.

*Id.,* at 14.

2. Law Code Chapter V
   The Rule in *Chapter V* provides:

The lawyer shall not advise or represent both sides of a dispute and, save after adequate disclosure to and with the consent of the clients or prospective clients concerned, shall not act or continue to act in a matter where there is or is likely to be a conflicting interest.

Law Code, at 16. Commentary No. 8 to the Rule states:

A lawyer who has acted for a client in a matter should not thereafter act against the client (or persons who were involved in or associated with the client in that matter) in the same or any related matter, or take a position where the lawyer might be tempted or appear to be tempted to breach the Rule relating to confidential information. It is not, however, improper for the lawyer to act against a former client in a fresh and independent matter wholly unrelated to any work the lawyer has previously done for that person.

*Id.* at 17-18. As to the ethical duties set forth in Chapter V, the lawyer has the burden of showing good faith and that adequate disclosure was made in the matter and that the client's consent was obtained. *Id.* at 18.

II. To What Entity Do Barton's Ethical Duties Run

As a general rule, only the former client may move for disqualification. *Bieter Co. v. Blomquist, 132 F.R.D. 220, 224 (D.Minn. 199)* (citing *In re Yarn Processing Patent Validity Litig., 530 F.2d 83, 88 (5th Cir.1976)*). The Law Code defines "client" as "a person [FN22] on whose behalf a lawyer renders or undertakes to render professional services." Law Code, at vii. Barton left his employment with Crown PCS in 1988; thus, he could not have rendered any professional services to PCS, Inc. after it acquired the assets of Crown PCS in 1989. The threshold issue, therefore, is one of "standing," not as a matter of constitutional law, but rather as a matter of determining whether PCS, Inc. may bring Barton's alleged disclosures to the attention of this Court. Determining this issue is necessary because Plaintiffs claim that only Crown PCS/CIC, and not either PCS, Inc. or PCS Sales, was Barton's client; hence, Barton had no duty to maintain either of the latter's confidences or avoid engaging in activity giving rise to a conflict of interest vis a vis PCS, Inc. or PCS Sales.

Determining which entity is Barton's former "client" turns on the nature and effect of the 1989 corporate transaction between PCS, Inc. and Crown PCS. Plaintiffs claim that Crown PCS' transfer of substantially all its assets and liabilities to PCS, Inc. was a mere "reorganization"; such a transaction did not have the effect of shifting Barton's ethical duties to PCS, Inc.-including any limits on Barton's ability to use and disclose information he obtained while representing Crown PCS.

**\*10** Defendants respond that under the reorganization plan, Crown PCS and PCS Mining transferred substantially all their assets to PCS, Inc., said assets generally described as "all property

and assets owned at closing by [Crown PCS] ... of every kind and description, wheresoever situate, both real and personal and tangible and intangible, without limitation to the generality of the foregoing...." PCS Sale Agreement, at 2, Hampton Aff., Exh. A. In exchange for the described assets, PCS, Inc. assumed all of the liabilities of Crown PCS and PCS Mining, and Crown PCS and PCS Mining became the beneficial owners of 100% of the outstanding shares of PCS, Inc. Under Canadian and United States law, Defendants contend, the transaction between Crown PCS and PCS, Inc. was a "de facto merger"; thus, for all practical purposes, PCS, Inc. is Crown PCS under a different name.[FN23]

In support of their respective positions, the parties have provided the Affidavits of two Canadian attorneys, Gary Semenchuck for Plaintiffs, *see* Bruckner Aff., Exh. J, and Donald McKercher, for Defendants,[FN24] *see* McKercher Aff., both of whom opine on how Canadian law would view the 1989 transaction. Semenchuck asserts that the transaction did not alter Barton's relationship with Crown PCS/CIC because (1) the PCS Sales Agreements, *cited in* Hampton Aff., Exhs. A and B, do not provide that Barton's duty of loyalty or confidence would transfer from Crown PCS to PCS, Inc., and (2) in the time since the transaction, CIC-formerly Crown PCS-has asserted a right to claim the privilege and object to any disclosures. Semenchuck Aff., ¶ 10. Neither Plaintiffs nor Semenchuck, however, has cited to the Court any authority supporting his opinions.

McKercher opines that under Canadian and English law, the privilege concerning confidential communications between a solicitor and client may be asserted by the client's "successor in title." McKercher Aff., ¶¶ 14-17. McKercher further opines that in matters dealing with legal ethics, "substance must take precedence over form." *Id.* ¶ 19. Accordingly, he continues, since Crown PCS became, for all intents and purposes, PCS, Inc. upon the 1989 privatization, PCS, Inc. should have standing to hold Barton to his ethical duties. *Id.* ¶ 19.

The Court concludes that the privilege Barton owed to Crown PCS passed to PCS, Inc. upon the privatization of Crown PCS.[FN25] A reading of (1) the Potash Act, (2) the Sales Agreements governing the transaction between Crown PCS and PCS, Inc., and (3) the Prospectus issued for the post-privatization sale by the Province of Saskatchewan of thirty-seven percent of the common shares of PCS, Inc., reveals that the transaction between Crown PCS and PCS, Inc. was not a "mere transfer of assets"; rather, the transaction was the means by which the Province of Saskatchewan created a private, share capital version of Crown PCS, as it existed prior to the 1989 transaction.

**\*11** The Potash Act specifically terms PCS, Inc. as the "purchaser corporation," Potash Act, § 2(1) (q); it further provides that Crown PCS was empowered to "enter into transactions that provide, directly or indirectly, for the sale, assignment, transfer or other disposition of all or substantially all of the [assets of Crown PCS] and the assets of [Crown] PCS subsidiaries to the *purchaser corporation* on any terms and conditions" approved by the Lieutenant Governor of Saskatchewan. *Id.* § 3(1) (emphasis added). The Potash Act, therefore, specifically provides that PCS, Inc. must be *the* purchaser of all or substantially all assets of Crown PCS.[FN26]

More importantly, the Potash Act also provides:

With respect to a transaction mentioned in section 3, for the purposes of the Subsurface Mineral Regulations, 1960 ... where the *purchaser corporation* has acquired all or substantially all of the [Crown] PCS assets or assets of a [Crown] PCS subsidiary, the *purchaser corporation* is deemed to be:

(a) the *same corporation as;* and

(b) *a continuation of each of;*

[Crown] PCS or the [Crown] PCS subsidiary, as the case may be, on those terms and conditions that the Lieutenant Governor in Council may prescribe.

*Id.* § 6(3) (emphasis added). This provision strongly indicates that the enacting legislature intended that upon the sale to PCS, Inc. of all or substantially all of the assets of Crown PCS, PCS, Inc. would

be the same corporation as Crown PCS, except for the nature of its ownership. *See also* Prospectus, Hampton Aff., Exh. C, at 4. Therefore, although the 1989 transaction between Crown PCS and PCS, Inc. was accomplished pursuant to formal agreements having the appearance and form of an "assets for stock" transaction, the Potash Act provided that the transaction, was, in reality, a mere change in identity and form.

In sum, PCS, Inc. succeeded to all that Crown PCS had or was. Accordingly, pursuant to the Act, and the "successor in title" doctrine,[FN27] the obligations Barton owed Crown PCS as its former counsel became obligations owed to PCS, Inc. PCS, Inc., therefore, has standing to seek disqualification based upon Barton's alleged violations of his ethical duties.[FN28]

III. Does the "Crime/Fraud" Exception Apply to the Claimed Disclosures
Even though Barton's ethical duties of loyalty and confidence shifted to PCS, Inc. as a consequence of the Potash Act and the 1989 transaction between Crown PCS and PCS, Inc., the actions and claimed disclosures identified herein would be consistent with those ethical obligations if the allegedly confidential communications at issue are excepted from the ethical rules by what Plaintiffs have termed the "crime/fraud exception" to Chapter IV of the Law Code. The communications are excepted, Plaintiffs claim, because each related to an ongoing conspiracy to violate the antitrust laws.

Defendants respond that the crime/fraud exception does not apply to the communications Barton disclosed in the Memorandum and other documents and communications. Defendants further respond that the crime/fraud exception does not apply to Barton's duties to avoid conflicts of interest under Chapter V of the Law Code.

   **\*12** The Rule in Chapter IV does not expressly state that there is a general crime/fraud exception to the duties contained in Chapter IV. To establish that such an exception applies, Plaintiffs principally rely on the Supreme Court of Canada's decision in *Descoteaux v. Mierzwinski* [1982] 141 D.L.R. (3d) 590, 1 S.C.R. 860, and Note 9 to Chapter IV of the Law Code: "There is no duty or privilege where a client conspires with or deceives his lawyer." [FN29] Law Code, at 15 (citing *The Queen v. Cox* [1885] L.R. 14 Q.B.D. 153 (C.C.R.). *See generally,* Hieck Opinion, at 1-4 (discussing exception).

Although plaintiffs argue at great length about the applicability of the crime fraud exception, when examined closely, the Court concludes that the exception does not apply here. First, Canadian courts' discussions of that exception indicate that it is narrow, applying only where communications to a solicitor "are criminal in themselves, or intended to further any criminal purpose," i.e., a client communication "made for the purposes of obtaining legal advice to facilitate the commission of a crime." *Descoteaux,* at 609 (citing *R. v. Cox and Railton* [1884] 14 Q.B.D. 153, 167). Thus, client communications for the purpose of advising a client "how to carry through a fraud" or "plan, execute, or stifle an actual fraud" are not subject to any duty of confidentiality. *Regina v. Bennett* [1963] 41 C.R. 227, 231 (B.C.S.C.) (quoting *O'Rourke v. Darbishire* [1920] A.C. 581, 613 (Sumner, L.J.); *id.* at 621-22 (Parmoor, L.J.)). Communications of this sort, however, must be distinguished from (a) client communications which relate to criminal or fraudulent acts that may have taken place in the past or (b) communications which may or may not amount to a crime or a fraud, even where a crime or fraud has been alleged against the client. *Regina,* 41 C.R. at 229-30, 232.

Here, almost all of the statements identified in the Memorandum and elsewhere as "evidence" of anti-competitive conduct concern (1) statements about what Childers had done or said (in the past) in connection with his alleged desire to increase prices, *see* Memorandum, at 3 (detailing comments Childers made on June 22, 1987), (2) what others told Barton Childers had said, *see id.* at 4 (detailing statements made to Barton by attorney's from PCS, Inc.'s American counsel, Arent Fox), or (3) statements by Childers about what other people had said or done. *Id.* at 7 (detailing a statement by Childers about a telephone call between Provincial officials and executives of IMC). In addition, Barton's few reports of actual conversations between himself and Childers reveal that Childers' statements in those conversations related to whether certain conduct could be seen as anti-competitive, not to how the anti-competitive conduct could be furthered. *See id.* at 8 (Childers stated that he was concerned about statements made to him by a PC America executive). Similarly, certain of Barton's statements indicate that those conversations concerned past statements which might or

might not reveal anti-competitive activity. *Id.* at 9 (Barton details to Childers his concerns about certain statements Childers made and Childers replies that "he guessed he shouldn't have said that").

**\*13** In addition, the only use to which the allegedly confidential communications have been put relates to a *civil* antitrust action against members of the potash industry. No crime has been charged or alleged against PCS, Inc. or Crown PCS. Furthermore, this Court is unable to conclude that any of the alleged statements was either an "element of a crime" or "criminal in purpose;" and yet, that is what they must have been in order to be excepted from the Rule in Chapter IV of the Law Code.[FN30] Law Code, Ch. IV, n. 10. Similarly, the statements cannot be said to have been "made with a view to obtaining legal advice to facilitate the commission of a crime." *Descoteaux,* 141 D.L.R. (3d) at 609.

In summary, when reviewed against the backdrop of the Rule in Chapter IV of the Law Code and the crime/fraud exception applied thereto, the statements detailed in the Memorandum and elsewhere were not statements (a) concerning an element of a crime or a fraud, (b) used to facilitate a crime or fraud, or (c) criminal or fraudulent in purpose. As such, communications Barton heard in his role as solicitor [FN31] were "information concerning the business and affairs of the client acquired in the course of the professional relationship," Law Code, Ch. IV, Rule, and Barton had a continuing duty to hold those statements in strict confidence.[FN32]

Equally unavailing is Plaintiffs' reliance on the "public interest" exception that is discussed at pages 3-4 of the Hleck Opinion. None of the cases cited in support of that exception, particularly *Initial Services, Ltd. v. Putterill* [1967] 3 All E.R. 145, *Glover v. Bell Canada* [1980] 42 N.R. 475 (Ont.Ct.App.), *aff'd,* and *Steintron Int'l Elec. Ltd. v. Vorberg* [1986] 10 C.P.R. (3d) 393 (B.C.S.C.), involved employees who served as *counsel* for the employer; as a result, the Court is not convinced that the public "interest" behind the decisions in *Putterill, Glover,* and *Steintron* also supports applying the public interest exception to Barton's ethical duties.

IV. Ethical Duties Violated

Properly viewed, Barton's actions can be described as follows: he took information that he had acquired during his employment as General Counsel at Crown PCS and sought out American counsel with an eye towards using that information to promote litigation against the potash industry and obtain a financial benefit for himself.[FN33] Through the Agreement he reached with Plaintiffs' counsel, Barton provided Plaintiffs' counsel with confidential information about his former client, obtaining for himself a significant financial benefit: $180,000.

Having determined that Barton had an ethical obligation to maintain the confidence of the communications, actions, and disclosures of which he became aware as a result of serving as General Counsel to Crown PCS, a review of the Memorandum and other documents, as well as of relevant deposition testimony, compels a conclusion that Barton engaged in conduct that violated his ethical duties under Chapter IV of the Law Code. First, Barton violated the clear language of the Rule in Chapter IV of the Law Code by failing to hold in strict confidence all information concerning the business and affairs of his client acquired in the course of the professional relationship.[FN34] Barton's actions also breached Commentary No. 5 to the Rule in Chapter IV.

**\*14** Barton's conduct also violated the Rule in Chapter V of the Law Code. The Law Code adopts the Supreme Court of Canada's analysis of conflict of interest violations in *MacDonald Estate v. Martin* [1990] 77 D.L.R. (4th) 249 (Can.), as "the standard which will be used by the courts in determining whether a lawyer ought to be disqualified as a result of a conflicting interest." Law Code, Ch. V, n. 8. In *Martin,* the question before the Canadian Supreme Court was whether a law firm should be disqualified from representing the plaintiff because a junior member of the law firm had previously worked for the defendant's former solicitor. *Id.* at 249. The trial court ruled in favor of disqualification, but the Manitoba Court of Appeal reversed. On appeal, the Canadian Supreme Court determined that the Rule and Commentary in Chapter V of the Code of Conduct adopted by the Law Society of Manitoba-which is identical to Chapter V in the Law Code-supplied the basic rule upon which alleged conflicts of interest should be determined. *Id.* at 256-57.

The *Martin* court reasoned that in determining whether a conflict of interest required

disqualification under Chapter V, two questions must be answered: (1) did the lawyer receive confidential information attributable to a solicitor-client relationship relevant to the matter at hand; and (2) is there a risk that it will be used to the prejudice of the client? *Id.* at 267. If the first question is answered in the affirmative, the second question answers itself: "A lawyer who has relevant confidential information cannot act against his client or former client. In such a case the disqualification is automatic. No assurances or undertakings not to use the information will avail." [FN35] *Id.* at 268.

Applying the *Martin* analysis to this case, Barton did receive confidential information attributable to his solicitor-client relationship with Crown PCS and that information is relevant to the antitrust claims alleged against PCS, Inc. and the other defendants. Following, the second question must also be answered in the affirmative; indeed, the issue here is *not* whether there is a "risk" of disclosure; disclosures of confidential information have occurred. Because the *Martin* test supports a conclusion that Barton operated under a conflict of interest in violation of the Rule in Chapter V of the Law Code, Barton most likely would be disqualified had this action arisen in Canada and had Barton been acting as a solicitor for plaintiffs in a Canadian court. [FN36] Moreover, given the importance Canadian courts have attached to a lawyer fulfilling his or her ethical duties,[FN37] the fact that Barton is acting as a "consultant" in an action venued in the United States is immaterial to this Court's conclusion that he violated his duties under Chapter V.

Barton also violated the Rule in Chapter V by taking a position where he was tempted to-and did-breach the Rule relating to confidential information. Law Code, Ch. V, Commentary No. 8. As reasoned above, that Barton is serving as a "consultant" to, and not as a lawyer for, Plaintiffs makes no difference; the risk that Barton would divulge confidences through his role as consultant is just as real.

**\*15** Finally, Chapter V states that "[t]he *Martin* decision concerned the situation where a lawyer moved from a firm acting on one side of a file to a firm acting on the other side. There are other instances where concerns about acting against a former client's interests arise." Law Code, ch. V, n. 8. One of the decisions cited as an example of such a situation is *Sheppard v. Frind* [1941] S.C.R. 531 (S.S.C.). In *Sheppard,* plaintiff was the former client of the defendant, a solicitor. Following a dispute over a bill of costs, the solicitor-client relationship ended. Thereafter, the solicitor contacted his former client's estranged wife and "incited her and improperly encouraged her to prosecute an action in which he [the solicitor] had no legal interest, thus stirring up a litigation against the former client." *Id.* at 535.

Although *Sheppard* was decided upon an action brought by the former client for damages and not a motion for disqualification, the Law Code's reliance on the decision as an example of improper conduct is instructive. Leaving aside Barton's disclosures to government officials and CIC, his efforts to find counsel interested in his information, the primary value of which was to "stir up" or further a private antitrust suit against members of the potash industry-including his former client-is the same sort of conduct found improper in *Sheppard* and Chapter V.

In summary, Barton's ethical duties as a lawyer of the Law Society of Saskatchewan prohibited him from (1) divulging confidential information he acquired during the course of representing Crown PCS, and (2) engaging in conduct creating either a conflict of interest or a risk that confidences would be disclosed to the prejudice of his former client. Upon PCS, Inc. purchasing Crown PCS' assets in 1989, Barton owed those duties to PCS, Inc. By subsequently disclosing the statements and acts detailed in the Memorandum and other papers as well as by communicating with Plaintiffs' counsel in his role as a hired "consultant," Barton divulged information that was "confidential information" under the Law Code. By engaging in that conduct, Barton breached both his duty of confidence under Chapter IV of the Law Code and his duty under Chapter V of the Law Code to avoid acting in a manner detrimental to his former client.[FN38] It is immaterial that Barton is not serving as counsel to Plaintiffs; nothing in the Law Code exempts a lawyer from his ethical obligations based solely on the manner in which he or some party characterizes the lawyer's involvement in litigation against that lawyer's former client. Moreover, the substance of Barton's involvement controls over any labels used to characterize his relationship with this litigation. See *Fund of Funds v. Arthur Andersen & Co., 567*

F.2d 225, 235 (2d Cir.1977).

V. Remedying the Ethical Violations

Having concluded that Barton violated his ethical duties under the Law Code, the Court must determine the appropriate remedy to apply here, given that Barton's violations have occurred in connection with the prosecution of this case. Defendants urge the Court to both disqualify all Plaintiffs' counsel and dismiss the Complaints.

A. Disqualification of Counsel

**\*16** Disqualification is an ethical, not a legal matter, and is in the public's, as well as the client's, interest. *Arkansas v. Dean Foods Prod. Co., 605 F.2d 380, 385 (8th Cir.1979)*, *overruled on other grounds*, *Firestone Tire & Rubber Co. v. Risjord, 612 F.2d 377 (8th Cir.1980)*, *vacated and remanded*, *449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981)*. Among the factors to be considered in determining whether attorney conduct warrants disqualification are the Court's duty to maintain public confidence in the legal profession and its duty to insure the integrity of the judicial proceedings. *United States v. Agosto, 675 F.2d 965, 969 (8th Cir.1982)*. In addition, Defendants, particularly, PCS, Inc., have an interest in a trial free from even the *risk* that confidential information has been unfairly used against it.[FN39] *Williams v. Transworld Air Lines, Inc., 588 F.Supp. 1037, 1046 (W.D.Mo.1984)*. Given these factors, disqualification is appropriate where an attorney's conduct threatens to work a continuing taint on the litigation and trial. *In re Wirebound Boxes Antitrust Litig., 724 F.Supp. 648, 653 (D.Minn.1989)*. Finally, where a question of disqualification is before the Court, any doubt must be resolved in favor of disqualification. *Coffelt v. Shell, 577 F.2d 30, 32 (8th Cir.1978)* (citation omitted).

Were Barton an attorney admitted to practice in this Court and thus subject to the Court's inherent jurisdiction to supervise the members of its bar, his actions would warrant disqualification. In this case, Plaintiffs' co-lead counsel and other counsel did not themselves divulge confidential information learned as a result of an attorney-client relationship; however, they did engage the services of, and associate with, an attorney who did. The question, here, therefore, is whether the relationship between Barton and Plaintiffs' counsel warrants their disqualification. The following statement in *Ackerman v. National Property Analysts, Inc.,* 1993 WL 258679 (S.D.N.Y. July 2, 1993) is instructive:

> the Court recognizes the need to prohibit plaintiffs from obtaining an advantage that they would not otherwise have achieved but for [the former counsel's] disclosures. Disqualification of a party's chosen counsel, however, is a severe remedy which should only be done in cases where counsel's conduct will probably "taint the underlying trial."

slip op., at 6 (citing *Morin v. Trupin, 728 F.Supp. 952, 957 (S.D.N.Y.1989)*).

Plaintiffs' counsel contend that none of them should be disqualified because they acted in good faith by relying on the Hieck Opinion and Joel Davidow's statements to Jerry Cohen. Plaintiffs further contend that in no event should a disqualification order extend to (1) those plaintiffs' counsel who have had no contact with Barton and acquired no information from him,[FN40] or (2) defendants other than PCS, Inc. and PCS Sales.

Under the facts and circumstances of this case, the Court concludes that counsel having direct contact with Barton must be disqualified to protect the Defendants' interest in litigation free from Barton's ethical violations. The evidence is conclusive that Plaintiffs' co-lead counsel (the Cohen Firm, the Heins Firm, and the Berger Firm) and other Plaintiffs' counsel in this category, had direct contact with Barton, either prior to engaging Barton's services, or thereafter, or both. In doing so, those counsel knowingly formally affiliated themselves with either (a) the former counsel of a defendant in this action, or (b) counsel who had affiliated themselves with a former counsel of a defendant. Establishing contact with Barton alone created a risk that confidential information would be disclosed; however, Plaintiffs' co-lead counsel went much further when they agreed to hire Barton as a "consultant," and, thereafter, met with Barton, reviewed his information, and had Barton review the factual allegations in the *Potash Complaint*. These actions, even if done in good faith (assuming that the Hieck Opinion and Joel Davidow's opinion could establish "good faith") were done knowingly.

Those counsel cannot remove from their cognition or strategy the information Barton wrongfully communicated to them; certainly, the Court is unable to conclude that such a purge is likely to occur, even if counsel were to attempt it. Accordingly, the benefits of that relationship would, if permitted, continue to both provide those counsel with an unfair advantage and taint these proceedings.

**\*17** What is more, Plaintiffs' co-lead counsel (at least) were aware that Barton's activities raised the question whether he was improperly disclosing confidential information; the issue was discussed prior to retaining Barton. As a result, counsel accepted the risk that a court would reject the Hleck Opinion and conclude that Barton's acts and disclosures were improper. Based upon an analysis of the record before the Court, the following counsel will be disqualified from any further involvement in this case and from having any contact with Plaintiffs in matters relating to this case: Cohen, Milstein, Hausfeld & Toll; Heins, Schatz & Paquin; Berger & Montague; Fine, Kaplan & Black; Chestnut & Brooks; Levin, Fishbein, Sedran & Berman; and the law firms represented by John Wilson and Allen Buckalew, if different from the firms mentioned above.[FN41]

Other counsel had no direct contact with Barton, but they (1) reviewed the Memorandum and/or other materials prepared by Barton that contain or relate to improperly disclosed confidences, or (2) admitted that they knew information which may have originated with Barton. As to these counsel, the Court is unable to conclude that they could expunge from their minds the confidential information contained in the material they reviewed. The Court also is unable to conclude that continued participation by these counsel would not further taint these proceedings. Because any doubts must be resolved in favor of disqualification, the following counsel will be disqualified: Kohn, Nast & Graf; Siegel, Brill, Gruepner & Duffy; Much, Shelist, Freed, Denenberg & Ament; Cochrane & Bresnahan; [FN42] and Brown & Wood.

Because the Court's concern in a disqualification motion is with removing the taint that may attach to the judicial process, there are instances in which improper disclosures of confidential information do not warrant disqualifying counsel. In this case, the Court concludes that it would be improper to disqualify any Plaintiffs' counsel which have not been shown to have had any direct or indirect contact with Barton or his materials. As to this class of counsel, the record demonstrates that their sole exposure to Barton's improper disclosures was limited, at most, to reviewing the allegations in the Complaints and materials submitted in connection with the instant motions. [FN43] In many cases, counsel were not even aware of Barton's existence or his relationship with this litigation. Defendants have failed to direct the Court to any authority holding that disqualification is appropriate where counsel's connection with both the divulging lawyer and co-counsel was so tenuous. Accordingly, counsel not identified above will not be disqualified. [FN44]

In summary, it is proper to disqualify counsel where they knowingly associate with a lawyer who divulges confidential information in a manner prejudicial to his former counsel, or where counsel know enough to improperly benefit from those disclosures, even though they have no direct contact with the divulging lawyer. As to both classes of counsel, disqualification is required in order to inoculate the litigation against a continuing taint. However, where counsel are exposed to disclosed confidences only through documents created during the course of the instant litigation, and thereby become unknowing recipients of confidential information, a court's concern for the integrity of the judicial process and desire to protect the former client are outweighed by the plaintiff's right to select counsel of its choice. If Defendants subsequently believe that confidential information is being or may be disclosed, they may seek protection under the relevant rules of privilege.

*B. Dismissal of Complaints*
**\*18** Determining the proper remedy for any taint staining the Complaints in *Potash, Tolley's,* and *Reamford* is an easier undertaking. Notwithstanding Plaintiffs' assertion that they acquired information about the actions of the potash industry from independent sources and had, by the end of January of 1993, uncovered "substantial evidence of a price fixing conspiracy," ( *see* Mem.Opp'n Mot. to Disq. and Dismiss, at 10); Cohen Aff. ¶¶ 3-5, the record is conclusive that certain factual allegations contained in the Complaints, especially those concerning (a) the alleged agreements between the Canadian defendants and United States defendants, and (b) Defendants' attempts to disguise the conspiracy, are virtually identical to factual assertions made by Barton in the

Memorandum. Indeed, Plaintiffs' counsel admitted that their conspiracy claims could not have been stated in the same way without information from Barton. Montague Dep., at 194; Oct. 25, 1993 Hrg.Tr., at 49. In addition, it is undisputed that Barton reviewed a draft of the original complaint in this action.[FN45] In short, nothing Plaintiffs have offered is sufficient to controvert Defendants' assertion that Barton played a substantial role in preparing the Complaints filed in *Potash* and *Tolley's* and *Reamford* (both of which are substantially identical to the *Potash Complaint*). Unless, the Complaints are dismissed, therefore, the Court cannot be assured that the taint from Barton's violations will be removed from subsequent litigation.

If, as Plaintiffs contend, there is sufficient independent information to support an antitrust action against the Defendants, nothing will prevent Plaintiffs and any remaining counsel from bringing those claims via new complaints. The Plaintiffs in *Potash, Tolley's*, and *Reamford*, therefore, will be given thirty (30) days in which to file Amended Complaints which satisfy the provisions of Fed.R.Civ.P. 11, and which are based on facts and information independent from Barton's ethical violations. If Plaintiffs fail to file Amended Complaints in *Potash, Tolley's,* or *Reamford* prior to the expiration of 30 days, the claims in that matter will be dismissed without prejudice. [FN46]

### Defendants' and Kalium's Motion to Dismiss

Having determined that the Complaints must be refiled, the Court declines to pass on the various Motions to Dismiss on the merits. However, the Court notes (for purposes of influencing Defendants' and Kalium's future conduct), that those motions were not supported by existing law and would, therefore, have been denied. The Court, however, reserves judgment on the legal sufficiency of any subsequently alleged conspiracy claim, should such a claim be subjected to a Motion to Dismiss.

### Conclusion

Based upon the foregoing, and the records, files, and proceedings herein, including the briefs and arguments of counsel, IT IS ORDERED that:

1. Defendants' Joint Motion to Disqualify Plaintiffs' Counsel and Dismiss Complaints (Doc. No. 48) is GRANTED as to the disqualification of certain Plaintiffs' counsel, as identified herein, and is, in all other respects, DENIED. The following counsel are disqualified from any further involvement in this case and from having any contact with Plaintiffs in matters relating to this case: Cohen, Milstein, Hausfeld & Toll; Heins, Schatz & Paquin; Berger & Montague; Fine, Kaplan & Black; Chestnut & Brooks; Levin, Fishbein, Sedran & Berman; Kohn, Nast & Graf; Siegel, Brill, Gruepner & Duffy; Much, Shelist, Freed, Denenberg & Ament; Cochrane & Bresnahan; Brown & Wood; and the law firms represented by John Wilson and Allen Buckalew, if different from the firms mentioned above.

**\*19** Plaintiffs have thirty (30) days from the date of this order to file Amended Complaints in *Potash*, 3-93-197, *Tolley's*, 3-93-556, and *Reamford*, 3-93-555. Any counsel filing Amended Complaints in any of the aforelisted actions shall also file, concurrent with the Amended Complaint, an Affidavit stating that counsel had

(a) no contact, direct or indirect, with Keith Barton;

(b) no contact, direct or indirect, with any materials or documents containing or describing disclosures made by Keith Barton;

(c) no discussions with any person concerning Keith Barton or any of his disclosures; and

(d) no role in any arrangement to retain Barton as a consultant in this matter.

If Plaintiffs in *Potash, Tolley's,* or *Reamford* fail to file Amended Complaints within 30 days of the date of this Order, their claims against Defendants will be DISMISSED WITHOUT PREJUDICE;

2. the Joint Motion of Certain Defendants to Dismiss (Doc. No. 45) is DENIED as moot; and

3. the Kalium Defendants' Motions to Dismiss (1) the First Amended Consolidated Class Action

Complaint in *Potash,* 3-93-197 (Doc. No. 46), (2) the Complaint in *Reamford,* 3-93-555 (Doc. No. 53), and (3) the Amended Complaint in *Tolley's,* 3-93-556 (Doc. No. 6) are DENIED as moot.[FN47]

FN1. The defendants in these cases are New Mexico Potash Corporation, Eddy Potash, Inc., Mississippi Chemical Corp., Potash Corporation of Saskatchewan, Inc., Potash Corporation of Saskatchewan Sales, Ltd., Kalium Chemicals, Ltd., Kalium Canada, Ltd., Noranda, Inc., Noranda Minerals, Inc., Noranda Sales Corporation, Ltd., Central Canada Potash Co., IMC Fertilizer Group, Inc., Potash Company of American, Inc., Cominco, Ltd. and Cominco American Incorporated. Hereinafter, "Defendants" means all the defendants; where individual defendants are discussed, they will be identified separately.

FN2. "Potash," a mineral typically mined from land deposits, is widely used in the United States, primarily for agricultural purposes. It is one of the three basic raw materials (along with phosphate rock and nitrogen) used for fertilizer production. The predominant form of potash is "muriate of potash," also known as "potassium chloride." Muriate of potash is available in three different particle sizes-standard, coarse, and granular. Additional forms of potash include sulfate of potash, manure salts, soluble and chemical grades of muriate of potash and sulfate of potash-magnesium. Muriate of potash constitutes nearly all of the potash consumed in the United States.

FN3. Defendants base their motion to disqualify Plaintiffs' counsel and dismiss their Complaints on Plaintiffs' counsels' contacts with Keith Barton, a Canadian lawyer and former employee of one of the defendants to this action. *See infra* pp. 9-19.

FN4. The instant action, *In re Potash Antitrust Litigation,* Civ. No. 3-93-197 [hereinafter *Potash* ], is the result of the consolidation of 12 separate actions that were filed in this Court. Complaints containing substantially similar allegations and claims were filed in *Reamford Liquid Fertilizer, Inc. v. Potash Corporation of Saskatchewan, et al.* C.A. No. 1:93-3049 (N.D.Ill.1993) [hereinafter *Reamford* ], and *Tolley's, Inc. and James River Farm Service, Inc. v. Potash Corporation of Saskatchewan, et al.,* Civil Action No. 93-0040-L (W.D.Va.1993) [hereinafter *Tolley's* ].

On August 19, 1993, the Judicial Panel on Multidistrict litigation transferred to this Court, and consolidated for purposes of discovery and trial, the 12 separate actions subsequently consolidated in *Potash,* as well as *Reamford* and *Tolley's;* the multidistrict litigations bears MDL Docket No. 981. The Clerk of Court has assigned *Reamford* Civ. No. 3-93-555; *Tolley's* has been assigned Civ. No. 3-93-556.

The Defendants' "Joint Motion to Disqualify Plaintiffs' Counsel and to Dismiss Their Complaints" (Doc. No. 48) applies to all cases that, as of the October 25, 1993 hearing on the Motions considered herein, had been consolidated under MDL Docket No. 981, i.e, *Potash, Reamford,* and *Tolley's.* The "Joint Motion of Certain Defendants' to Dismiss" (Doc. No. 45), on its face extends only to the First Amended Consolidated Class Action Complaint in *Potash;* however, pursuant to a Stipulation filed on November 1, 1993 (Doc. No. 114), the parties in *Tolley's* agreed that the Joint Motion of Certain Defendants' to Dismiss will apply with equal force to *Tolley's;* hence, the disposition of that motion will apply with equal force to *Tolley's.* No such stipulation was filed with regard to *Reamford.*

Kalium has filed Motions, pursuant to Fed.R.Civ.P. 12(b)(6), to Dismiss (1) the First Amended Consolidated Class Action Complaint in *Potash* (Doc. No. 46), (2) the Amended Complaint in *Reamford* (Doc. No. 6), and (3) the Complaint in *Tolley's* (Doc.

No. 53). On November 1, 1993, Kalium and the plaintiffs in *Tolley's* stipulated that all memoranda filed in connection with Kalium's Motion to Dismiss in *Potash* would apply to Kalium's Motion to Dismiss in *Tolley's.* ( *See Potash* Doc. No. 114). The Stipulation did not extend to Kalium's Motion to Dismiss in *Reamford.*

A fourth action, *Coleman v. New Mexico Potash, et al.,* CV 93-3992 (CBM) [hereinafter *Coleman* ], was filed in the United States District Court for the Central District of California. On September 22, 1993, the Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order transferring this action to this Court. No stipulation has been entered with regard to *Coleman;* as a result, *Coleman* is not before the Court at this time.

FN5. In November 1989, it acquired all the assets and liabilities of Potash Corporation of Saskatchewan ("Crown PCS"); thereafter, Crown PCS changed its name to CIC Mineral Interests Corporation ("CIC"). At all relevant times, PCS, Inc. or Crown PCS were engaged in the business of producing and selling potash.

FN6. PCS Sales is a wholly-owned subsidiary of PCS, Inc.; at all relevant times, it has engaged in the business of selling potash.

FN7. Comincan is a wholly owned subsidiary of Cominco.

FN8. Plaintiffs also allege that various individuals, partnerships, corporations and associations, including subsidiaries and affiliates of Defendants and other manufacturers of potash, not named as defendants in this Complaint, have participated as co-conspirators in the violations alleged and have performed acts and made statements in furtherance thereof.

FN9. Plaintiffs refer to PCS, Inc., PCS Sales, PC America, IMC Kalium, Noranda, Central, Noranda Sales, Cominco and Comincan collectively as the "Canadian Defendants."

FN10. Plaintiffs refer to Mississippi, Eddy, and New Mexico collectively as the "American Defendants."

FN11. On December 16, 1991 Barton sent a letter to CIC's President, Don Ching, apparently as a follow-up to an earlier conversation. Newbould Aff., Exh. A. In that letter, Barton proposed to "undertake a review and analysis of the legal and persuasive options the Government might consider in developing its potash strategy." The letter also made reference to "activities in the industry since 1987 with which I [Barton] am familiar," *id.;* however, Barton did not specifically refer to any antitrust violations.

FN12. Borden & Ellis attorneys Frank Newbould and Paul T. Knudsen assisted Barton in preparing the Memorandum of Evidence.

FN13. In his Affidavit, Newbould states that CIC's refusal to waive any privilege with respect to a private antitrust action "should not be construed, nor were they intended to be, a positive assertion that the rights and privileges resulting from Mr. Barton's

representing Crown PCS before the privatization enured to the benefit of CIC Mineral." Newbould Aff., ¶ 6.

**FN14.** On December 21, 1992 Semenchuck sent a copy of the Hleck Opinion to Davidow. Bruckner Aff., Exh. G. In his Affidavit, attorney Jerry S. Cohen states that Davidow expressed to him "his strong concurrence" with the Hleck Opinion and that Davidow believed Barton's disclosures were proper under United States law, Cohen Aff., ¶ 8; however, neither Davidow nor the Dickstein Firm ever took a formal position in that regard.

**FN15.** The Agreement called for Barton to receive $15,000 on March 1, 1993, $30,000 on April 1, 1993, $45,000 on July 1, 1993, $45,000 on October 1, 1993 and $45,000 on January 1, 1994; all payments were to be in U.S. Dollars. Cohen Aff., Exh. A.

**FN16.** Defendants have represented to the Court that the materials the Cohen Firm obtained from Barton are contained in Exh. 12 to the Pederson Affidavit in Support of Defendants' Memorandum in Support of Defendants' Motion to Disqualify Plaintiffs' Counsel and Dismiss Complaints. Those documents include (1) an analysis of the potash industry, (2) a recitation of certain statements made by Childers to Barton or to which Barton was a witness, (3) witnesses to the alleged anti-competitive activity, and (4) the June 25, 1990 letter to Estey.

**FN17.** In his Affidavit, Jerry S. Cohen asserts that Barton's comments on the Complaint addressed only the factual accuracy of the allegations therein and did not involve any legal advice. Cohen Aff., ¶ 19. Cohen further asserts that Barton did not review any other pleadings or discovery materials. *Id.* ¶¶ 19-20. Barton also stated that he played no role in generating discovery requests. Barton Dep., at 49.

**FN18.** At that meeting, Barton and Plaintiffs' counsel discussed the potash industry, the companies and individuals involved in the potash industry and potentially, in the conspiracy, and potential sources of third-party discovery. Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories to All Plaintiffs, at 5, Pederson, Aff., Exh. No. 8.

**FN19.** *Potash Corporation of Saskatchewan, Inc. and Potash Corporation of Saskatchewan Sales, Ltd. v. Keith Barton,* No. C934178 (S.C.B.C.1993).

**FN20.** The Law Code applied here appears as Exh. C to the Affidavit of Donald S. McKercher. Pederson Reply Aff., Exh. No. 4. It was adopted by The Benchers of the Law Society of Saskatchewan on September 26, 1991, and took effect on October 1, 1991. Because Barton's acts occurred between 1988 and 1993, they are subject to both the Law Code and the version of the Code of Professional Conduct of the Law Society of Saskatchewan in effect between 1984 and 1991. *See* McKercher Aff., Exh. B. However, because the relevant provisions of the two codes are substantially identical, the Court's analysis will be limited to the Law Code.

**FN21.** Defendants support their assertion by citing two Fifth Circuit decisions, *In re Dresser Indus., Inc., 972 F.2d 540 (5th Cir.1992),* and *In re American Airlines, Inc., 972*

F.2d 605 (5th Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262 (1993), and an Eleventh Circuit decision, *In re Finkelstein*, 901 F.2d 1560 (11th Cir.1990). Although those decisions contain the language cited by Defendants, nothing therein alters the Court's conclusion that the ethical standards to which Barton must be held are those rules of conduct Barton pledged to follow, i.e., the Law Code.

FN22. Under the Law Code, "person" includes a "corporation or other legal entity, an association, partnership or other organization, the Crown in right of Canada or a province and the government or a state or any political subdivision thereof." Law Code, at vii.

FN23. The defendants contend that the transaction between Crown PCS and PCS, Inc. was a "de facto" merger under the majority American view stated in *Keller v. Clark Equip. Co.,* 715 F.2d 1280, 1291 (8th Cir.1983). Assuming that this doctrine generally would be pertinent to the matters before the Court, the nature and effect of the privatization and reorganization of Crown PCS must be determined by reference to the statute giving rise to the transaction; thus, whether the transaction would be considered a "de facto merger" or a mere transfer of assets in the majority of American courts is not dispositive.

FN24. Defendants have also submitted the Affidavit of a Saskatchewan lawyer, Gerald Lorne Gerrand, Pederson Reply Aff., Exh. No. 1; he opines that Barton's actions violate Chapter IV of the Code of Professional Conduct of the Law Society of Saskatchewan. Gerrand's opinion does aid in determining the effect of the 1989 transaction because Gerrand simply *assumes* that:

> the duty of Keith Barton to observe the confidentiality of the knowledge of the business and legal affairs that he acquired during his period of service as in-house counsel to Crown PCS continue with respect to [PCS, Inc.] and that the solicitor and client privilege that the solicitor client privilege that clothed the relationship continues for the benefit of [PCS, Inc.].

Gerrand Aff., ¶ 10.

Defendants have likewise submitted the Affidavit of PCS, Inc.'s current general counsel, John L.M. Hampton. *See* Pederson Reply Aff., Exh. No. 2. Hampton states:

> The company that began doing business as PCS, Inc. on November 8, 1989 was a complete and uninterrupted continuation of the company that had done business as Crown PCS until the previous day. There was complete continuity of management, personnel, physical location and business operations: the officers and management personnel were the same, the employees were the same, the assets and liabilities were virtually the same and the corporate logo was the same. In short, the business of Crown PCS was continued in its entirety by PCS, Inc.

Hampton Aff., ¶ 13. Hampton further states that Crown PCS, now CIC, maintained its corporate existence only for the purpose of selling its shares in PCS, Inc. to the public. *Id.,* ¶ 16. Currently, he continues, CIC holds approximately ten percent of the outstanding shares of PCS, Inc.; however, CIC is engaging in no ongoing activity or business operations. *Id.*

Although the Court accepts the facts as stated in Hampton's Affidavit, Hampton does not offer any legal basis for his opinions; hence, McKercher's Affidavit remains Defendant's sole authority for their assertions.

FN25. Determining the effect of the 1989 transaction was made more difficult by the failure of the parties to provide this Court with copies of any of the authorities they relied upon, the statute that gave rise to the 1989 transaction, or the decisions cited by the Canadian affiants each side used to support their respective positions. Although neither side apparently contemplated that this Court would choose to discern for itself the utility and meaning of *legal* decisions issued by Canadian *courts,* it has done so.

FN26. Section 6(1) of the Act provides that after Crown PCS conveyed all or substantially all of its assets to PCS, Inc., it or one of its subsidiaries could convey all or any remaining assets to any person or entity for any consideration, subject to the approval of the Lieutenant Governor.

FN27. Both parties argued over the extent to which certain "successor in title" cases establish that PCS, Inc. succeeded to Barton's ethical obligations to Crown PCS. Those decisions, particularly *Minet v. Morgan* [1873] L.R. 8 Ch. 367, and *IBM Canada, Ltd. v. Xerox of Canada, Ltd.* [1978] 1 F.C. 513, support a conclusion that when a company purchases assets which later become the subject of litigation, any duties of confidence a solicitor would owe to the seller if it still owned the assets are owed to the buyer. Accordingly, since the assets PCS, Inc. purchased from Crown PCS (which reasonably may be described as "the business" of Crown PCS) are the subject of litigation in these action, Barton owed to PCS, Inc. the duties of confidence and loyalty he previously owed to Crown PCS as a result of acting as its solicitor in relation to its business operations.

FN28. Having determined that PCS, Inc. has standing to assert that Barton breached his ethical duties and that those breaches have tainted this litigation, it is unnecessary to determine whether (1) Barton also owed similar duties to PCS Sales, or (2) CIC expressly or implied waived any rights it may have had to enforce Barton's duties of confidentiality and loyalty. Had such determinations been necessary, however, the record before the Court would compel answering both questions in the negative.

FN29. Plaintiffs also contend that the crime/fraud exception excepts the identified communications from the solicitor-client privilege existing under the rules of evidence. That issue is not before the Court. Moreover, a solicitor's duty of confidence to his client is broader than the evidentiary attorney-client privilege. Law Code, Ch. IV, n. 10. Accordingly, what is held to be non-privileged for purposes of the solicitor-client privilege if introduced in court may yet fall within the scope of the solicitor's duty of confidence to a former client.

FN30. Commentary No. 10 to Chapter IV provides that

"[d]isclosure of information necessary to prevent a crime will be justified if the lawyer has reasonable grounds for believing that a crime is likely to be committed...." This exception to the duty of confidence has no application here; the "crime," if any was committed, had been committed in 1987 and 1988.

FN31. As will be discussed *infra,* any communications or information Barton received while serving in a role other than General Counsel may not support a determination that Barton violated his ethical duties.

FN32. Plaintiffs also contend that the statements were not privileged because "[t]here is

no duty or privilege where a client conspires with or deceives his lawyer." *See* Law Code, Ch. IV, n. 9. Apparently, Plaintiffs claim that Barton was a co-conspirator with Crown PCS to fix potash prices. The record does not support a determination that Barton was a co-conspirator and there is no evidence that Barton was deceived by what his client was doing.

FN33. That Barton may have properly provided information to CIC, and through it to the Canadian and United States authorities, does not also mean that he could make his information available to the private bar without restriction on, or concern for, his ethical duties to his former client.

FN34. Certain disclosures in the Memorandum relate to communications Barton heard during executive and Board meetings, *see* Memorandum, at 2-3, 9. It is unclear whether Barton attended those meetings as General Counsel of Crown PCS or merely as a Vice President or Secretary. If Barton witnessed any communications while serving in a capacity other than as General Counsel, the communications would not be subject to a duty of confidence. Although some of the communications disclosed by Barton likely fall outside the duty of confidence, the vast majority of the disclosures in the Memorandum fall within the category of communications covered by Chapter IV of the Law Code.

FN35. *Martin* offered two reasons for concluding that disqualification should be automatic: (1) "The lawyer cannot compartmentalize his or her mind so as to screen out what has been gleaned from the client and what was acquired elsewhere," 77 D.L.R. (4th), at 268; and (2) "[m]oreover, the former client would feel at a disadvantage. Questions put in cross-examination about personal matters, for example, would create the uneasy feeling that they had their genesis in the previous relationship." *Id.* Barton's relationship with Plaintiffs' counsel raises both of these concerns in spades.

FN36. In *Martin,* the Supreme Court stated that:

> courts, which have inherent jurisdiction to remove from the record solicitors who have a conflict of interest, are not bound to apply a code of ethics. Their jurisdiction stems from the fact that lawyers are officers of the court and their conduct in legal proceedings which may affect the administration of justice is subject to this supervisory jurisdiction. None the less, an expression of a professional standard in a code of ethics relating to a matter before the court should be considered an important statement of public policy. The statement in c. V should therefore be accepted as the expression by the profession in Canada that it wishes to impose a very high standard on a lawyer who finds himself in a position where confidential information may be used against a former client.

77 D.L.R. (4th), at 256-57. This excerpt from *Martin* indicates that Canadian courts are not bound to apply the rules of professional conduct when determining whether disqualification is proper, but courts do look to the rules as authority for what is appropriate conduct by an attorney. This approach is similar to that followed by this Court.

FN37. The following statement best describes the important role served by enforcing a lawyer's duty of confidence and loyalty:

> Nothing is more important to the preservation of this relationship [between the legal profession and the public] than the confidentiality of information passing between a solicitor and his or her client. The legal profession has distinguished itself from other professions by the sanctity with which these communications are treated ... This

tradition assumes particular importance when a client bares his or her soul in civil or criminal litigation. Clients do this in the justifiable belief that nothing they say will be used against them and to the advantage of the adversary. Loss of this confidence would deliver a serious blow to the integrity of the profession and to the public's confidence in the administration of justice.

*Martin,* 77 D.L.R. (4th), at 255-56.

FN38. Notwithstanding Plaintiffs' arguments, the Court concludes that if Barton was subject to this Court's supervisory powers, it would conclude that Barton had violated the ethical duties established under Rules 1.6 and 1.9 of the Minnesota Rules of Professional Conduct.

FN39. Of course, the counter-balance to this concern is the recognition that disqualification motions are often brought for purely strategic purposes having little connection to a party's concern with ethical behavior. *See Fred Weber, Inc. v. Shell Oil Co., 566 F.2d 602, 609 (8th Cir.1977)* (citation omitted), *overruled on other grounds, Firestone Tire & Rubber Co. v. Risjord, 612 F.2d 377 (8th Cir.1980)*, *vacated and remanded, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981).*

FN40. Whether disqualification should extend to counsel that had no contact with Barton is also raised by (1) the separate responsive memorandum filed by Cochrane & Bresnahan, P.A., and the Affidavit of John A. Cochrane, and (2) the numerous affidavits of Plaintiffs' counsel which were submitted to Defendants in connection with certain discovery requests. *See* Pederson Aff., Exh. Nos. 15-16.

FN41. The decision herein is not specifically grounded on the "vicarious disqualification" doctrine discussed in *Perry v. Jeep Eagle Corp., 1989 WL 118750 (S.D.Ind.1989)*, at 5. Nonetheless, the principle supporting that doctrine, to wit: lawyers should not be permitted to gain advantage over an adversary by receiving disclosures of confidential information from some person who had a previous relationship with the adversary, supports the conclusions reached herein. *See e.g., Williams v. Trans World Airlines, Inc., 588 F.Supp. 1037, 1042-43 (W.D.Mo.1984).* Moreover, that principle applies with equal force to counsel who have access to such information, actual or potential, as a result of a co-counsel relationship. *See e.g., Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263, 1266 (7th Cir.1983).*

FN42. At ¶ 6 of his Affidavit in support of Cochrane & Bresnahan's Memorandum in Opposition to the instant motions, John A. Cochrane states that "[a]t no time has ... Affiant seen any material produced by Mr. Barton." Contradicting this assertion is Samuel D. Heins' deposition testimony that on June 17, 1993 he forwarded to Cochrane a copy of the Memorandum. Heins Dep., at 30; Heins Dep., Exh. 5. Heins' testimony concerning the June 17, 1993 letter indicates that someone at Cochrane & Bresnahan likely saw and reviewed the Memorandum; knowledge of its contents must be imputed to the rest of the firm. Accordingly, the Court is unable to conclude that Cochrane and Bresnahan's continued participation will not taint the proceedings.

FN43. Defendants' unauthorized strategy of warning certain Plaintiffs' counsel that reviewing any of the materials submitted in connection with this motion would taint them, was ineffective to actually taint any counsel.

FN44. The law firms of Greenfield & Rifkin, and Chimicles, Burt & Jacobsen are plaintiffs counsel in *Coleman*. Although that action has not been consolidated with *Potash,* the record demonstrates that neither firm should be disqualified.

FN45. That original complaint moved to the final stages and was filed after Barton was engaged as a "consultant" alone indicates that the primary complaint likely was influenced by Barton's disclosures, or review and comments, or both. Defendants are entitled to some reasonable degree of certainty that the basic pleadings do not result from the hostile use of confidential information.

FN46. The Court rejects as unworkable Plaintiffs' assertion that their claims against defendants other than PCS, Inc. and PCS Sales should not be dismissed. The allegations in the Complaints are too interwoven and fused for the Court to make any meaningful distinctions between and among any of the Defendants.

FN47. The Court assumes that no further orders will be necessary to prevent the dissemination of any information or materials relating to Keith Barton's duties of confidentiality and loyalty or to any communications or information falling within those duties.

D.Minn.,1993.
In re Potash Antitrust Litigation
Not Reported in F.Supp., 1993 WL 543013 (D.Minn.), 1994-1 Trade Cases P 70,644

Motions, Pleadings and Filings (Back to top)

• 3:93cv00197 (Docket) (Apr. 1, 1993)
END OF DOCUMENT

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.